| | | |
|---|---|---|
| JERRY FRANKS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.       1:18-cv-171 |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MONSANTO COMPANY, and | ) | |
| BASF CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Jerry Franks on behalf of himself, all others similarly situated, and the class he seeks to represent, and for his Complaint against Monsanto Company and BASF Corporation, states as follows:

## SUMMARY OF THE CLAIMS

1.     This is a Missouri class action against Monsanto Company ("Monsanto") and BASF Corporation ("BASF"). Plaintiff and putitive class members are agricultural farmers and/or agricultural farming organizations that raise crops in Missouri (hereafter, Plaintiff Jerry Franks and all others similarly situated, including the class he seeks to represent are referred to, collectively, as "Plaintiffs"). Plaintiffs have been victimized by Monsanto's defective Xtend seed system, BASF's dicamba-containing herbicides, and their purchasers' inevitable use of dicamba, a drift-prone herbicide that has affected millions of acres of farmland in the United States, causing widespread destruction of crops.

2.     The cause of this destruction to Plaintiffs' crops is Defendants' willful and negligent release of their dicamba products on the market. Defendants methodically engaged in a

coordinated, systematic plan to release their defective products onto the market, thereby ensuring that non-DT crops would be destroyed.

3.     In 2015 and 2016, Defendant Monsanto willfully and negligently launched its Xtend seeds, releasing Xtend cotton in 2015 and Xtend soybeans in 2016, without an effective and safe herbicide for use with Xtend crops. Defendant Monsanto did so even though it marketed its Xtend products as a "crop system" – Xtend seeds to be used in conjunction with its or Defendant BASF's dicamba herbicides. Defendant Monsanto knew farmers would purchase and use other dicamba herbicides to spray on its Xtend crops and Defendants encouraged farmers to do so, even though such spraying was not legal.

4.     At all times relevant to this Complaint, Defendant Monsanto and Defendant BASF (collectively, "Defendants") conspired to their mutual economic benefit to create a market for the components of this dicamba-based system. Both Defendants knew and consented to the release of Defendant Monsanto's Xtend seeds knowing such release would benefit both Defendants in a variety of ways.

5.     Defendant Monsanto would benefit from the sales of its defective and incomplete seed system. Defendant BASF, as the nation's largest seller of dicamba-based herbicides would benefit from the sale of its existing, older dicamba-based herbicides. In the long-term, both Defendants knew that the massive increase in the use of dicamba-based herbicides in 2015 and 2016 would create a fear-based marketing frenzy for Defendant Monsanto's Xtend seeds and XtendiMax herbicide and Defendant BASF's Engenia herbicide.

6.     In 2017, Defendants released their defective, unsafe, volatile dicamba herbicides – XtendiMax and Engenia, respectively – as the additional component of this already-defective Xtend crop system.

7.     Thus, Defendants knowingly conspired to set in motion the chain of events that has destroyed non-DT crops and forced farmers to buy and use Defendants' dicamba-based products out of self-defense.  The damage caused by off-label dicamba spraying over Xtend seeds caused the sale of these seeds and both companies' herbicides to skyrocket in what amounts to a modern-day agricultural protection racket.

8.     Defendants knew that dicamba herbicides cannot be applied safely to Xtend crops due to their extreme volatility and propensity to move off-target, which caused crippling damage to Plaintiffs' crops throughout 2015, 2016, and 2017 – with evidence of damage having been occurred in 2018.

## Jurisdiction and Venue

9.     At all times relevant to this Complaint, Defendant Monsanto is the entity that researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised, and sold its genetically modified ("GM"), dicamba-based Roundup Ready 2 Xtend crop system ("Xtend crop system") that includes Defendant Monsanto's dicamba-tolerant ("DT") cotton seeds, Bollgard 3 XtendFlex Cotton, Bollgard II XtendFlex Cotton, and XtendFlex Cotton (collectively, "Xtend cotton"), Defendant Monsanto's DT soybean seeds, Roundup Ready 2 Xtend soybeans ("Xtend soybeans") (collectively, "Xtend seeds" or "Xtend crops"), and its allegedly low-volatility dicamba-based herbicides, XtendiMax with VaporGrip Technology ("XtendiMax") and Roundup Xtend with VaporGrip Technology ("Roundup Xtend"), including each and every seed brand, trait, and variety of Defendant Monsanto's above-mentioned seeds and herbicides, to allegedly protect crops from harm caused by weeds, most especially from highly aggressive pigweeds such as Palmer amaranth, waterhemp, and marestail.

10.     Defendant Monsanto is a global agrochemical and agricultural biotechnology corporation, incorporated in the State of Delaware, with its world headquarters and principal place of business in St. Louis, Missouri.

11.     Monsanto was one of the first companies to apply biotechnology industry models to agriculture, and is most widely known for being the leading producer of GM seeds and herbicides such as Roundup, among other agricultural changes and biotechnological trait products.

12.     At all times relevant to this Complaint, Defendant BASF is the entity that researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised, and sold an allegedly low-volatility dicamba-based herbicide called Engenia for use on Xtend crops to allegedly protect crops from harm caused by weeds, most especially from highly aggressive pigweeds such as Palmer amaranth, waterhemp, and marestail.  Additionally, BASF researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised, and sold high-volatility dicamba-based herbicides.

13.     Defendant BASF is a subsidiary of BASF SE and is one of the largest chemical producers in the world.  Defendant BASF is incorporated in the state of Delaware and headquartered in Florham Park, New Jersey.  The registered agent for BASF in the State of Missouri is CT Corporation System, 120 South Central Avenue, Clayton, Missouri 63105.

14.     This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because this is a class action where members of the putative class are citizens of different states than Defendants and the aggregate claims of all members of the class are in excess of five million dollars, exclusive of interest and

costs. Plaintiffs are citizens of Missouri and other states all of whom conduct farming operations in Missouri.

15. This Court has personal jurisdiction over the parties because Plaintiffs systematically and continually conduct business throughout Missouri and submit to the jurisdiction of the Court and Defendants systematically and continually conduct business throughout Missouri, including the sale and distribution of its Xtend seeds and dicamba-based fertilizers. Moreover, Monsanto has its principal place of business and world headquarters in Missouri.

**16.** Venue is proper in this District because Defendants are engaged in substantial conduct and business relevant to Plaintiffs' claims within this District, and it is where Plaintiff resides and farms.

17. Plaintiff Jerry Franks is a resident of Dunklin County, Missouri.

18. Doe Plaintiffs are other similarly situated Plaintiffs who conduct farming operations in Missouri.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. What is Dicamba?

19. Dicamba is a highly volatile herbicide that is used on crops to kill weeds.

20. Defendant BASF was one of the, if not the first, manufacturer to distribute dicamba.

21. Since dicamba was first introduced about 50 years ago, weed scientists have noted some yearly occurrences of dicamba injury due to its use and off-target movement. *See* http://bulletin.ipm.illinois.edu/?p=3942 (last visited Aug. 21, 2017).

22. There are three primary ways dicamba, including Defendants' new dicamba-based herbicides, moves off-target and causes damage to surrounding crops and vegetation that have not been genetically modified to withstand dicamba.

23.     The first and most destructive cause of off-target movement is volatilization. Volatilization occurs when dicamba is applied to a crop but then evaporates and moves in the air as a gas.  This gas, or dicamba vapor, easily moves away from its intended target and can travel an immense distance before it settles on sensitive plants or other surfaces, thereby causing damage.

24.     After dicamba is sprayed on a crop, it can volatilize for many hours and days after application, thus increasing the scope of the damage it causes to crops.  Also, the volatility of already-volatile dicamba increases in the warmer months of a growing season – June, July, and August.

25.      The next way dicamba moves off-target is through physical drift.  Drift is the airborne migration of dicamba spray particles moved by the wind before the particles reach their intended target.

26.     Calm and windless environments that might otherwise minimize drift, such as in a temperature inversion, also increase the off-target movement of dicamba.

27.     The third way off-target movement of dicamba occurs is when dicamba is sprayed during a temperature inversion.  Here, the dicamba does not volatilize into a gas or move off-target because of drift.  Instead, when dicamba is sprayed into a temperature inversion, the fine spray particles of dicamba become suspended in a mass of cool air that hangs above the soil line.

28.     As this cool air mass containing suspended dicamba particles leaves the field with the slightest breeze, the fine dicamba particles travel with it.  The dicamba eventually falls out of suspension when the air mass warms many hours later, moving potentially miles away from its original location.

29.     The dangers posed by the volatile nature and off-target movement of dicamba alarm many weed scientists and farmers because many agricultural and specialty crops, including

Plaintiffs' crops, such as fruit trees, peaches, soybeans, cotton, tomatoes, watermelon, grapes, peanuts, and melons, among other crops, are ultra-sensitive to dicamba and can be damaged by extremely low doses of the herbicide.

**B.    Trajectory and Introduction of Defendants' Dicamba-based Products**

30.    The purpose of GM seeds is to help farmers combat problematic weeds that have evolved to resist certain herbicides.

31.    Defendant Monsanto's Xtend seeds are genetically modified to resist the herbicides dicamba and glyphosate, the latter being the main ingredient in Defendant Monsanto's most prized herbicide product, Roundup.

32.    Defendant Monsanto pushed its dicamba-based products, i.e., its Xtend crop system, in cooperation with Defendant BASF, onto the market to supplant existing crop systems, including Liberty Link – a crop system designed by Bayer Crop Sciences – and to move beyond Defendant Monsanto's Roundup Ready crop system, which has failed to control herbicide-resistant weeds that plague agriculture throughout the U.S., including Missouri.

33.    According to Dr. Sam Atwell, an agronomist at the University of Missouri, in an August 8, 2016 *Missouri Ruralist* article, "products like Roundup [are] failing completely."  *See* http://www.missouriruralist.com/story-caused-widespread-dicamba-drift-missouri-9-145000 (last visited Aug. 17, 2017).  This is a growing consensus in the agricultural scientific community.

34.    In 2015 and 2016, Defendant Monsanto distributed and sold an incomplete and defective "crop system" by releasing its Xtend seeds without a safe and effective herbicide.

35.    In 2017, Defendants then failed to provide an effective, safe, and non-defective herbicide for over-the-top use, i.e. once the seed is in the ground until it is harvested, on Xtend crops.

36.     By releasing their unsafe, defective dicamba products prematurely, Defendants created an economic and ecological disaster for farmers.  This was done with a single-minded, mutual goal – to increase the need and demand for their dicamba products, profit off the damage caused to farmers' crops, including Plaintiffs', and ensure that soybean and cotton farmers had no choice but to plant Xtend seeds or else risk the destruction of their crops to dicamba.  *See* http://www.reuters.com/article/us-usa-pesticides-dicamba-insight-idUSKBN1AP0DN     (last visited Aug. 22, 2017).

37.     Defendant Monsanto's own website identifies its Xtend seeds and dicamba herbicides as a "crop system" – meaning that Xtend seeds are meant to be used with a dicamba herbicide.

38.     It was not until late 2016, well past the 2015 and 2016 growing seasons and two years after Defendant Monsanto placed its Xtend seeds on the market, that the Environmental Protection Agency ("EPA") finally registered Defendants' dicamba herbicides for in-crop use. Prior to that, there was no legal dicamba available to use on Xtend crops.

39.     So, in 2015 and 2016, most farmers who purchased and grew Defendant Monsanto's Xtend seeds were left with the unenviable choice of either allowing their Xtend crops to be destroyed by weed overgrowth or using the only dicamba on the market at that time, older and highly volatile, drift-prone formulations of dicamba, such as Clarity, Banvel, Distinct, Marksman, and Status that are manufactured and sold by Defendant BASF.

40.     With a seed that is designed to resist dicamba, Defendants knew that farmers would apply older, highly volatile formulations of dicamba, many, if not most of them sold by Defendant BASF, on their Xtend soybeans and cotton.

41.     As Defendants knew, these herbicides could not be sprayed safely over-the-top on

Defendant Monsanto's Xtend crops.

42.     Some farmers, however, had Defendants' XtendiMax and Engenia herbicides for use in 2015 and 2016 through Defendants' permit and trial programs, such as Defendant Monsanto's Ground Breakers Field Trials Under Permit Program.  Numerous farmers in five states participated in these programs and used Defendant Monsanto's XtendiMax in test plots.  Brad Gilmer and Lance Lawson, partners in L&G Farms in New Madrid County, Missouri were among the farmers who participated.  *See* http://www.deltafarmpress.com/soybeans/missouri-bootheel-partners-spray-xtendimax-legally-and-safely;

http://www.missourifarmertoday.com/news/crop/farmer-plants-monsanto-s-new-dicamba-tolerant-beans/article_ae61cea4-f429-11e4-86dc-fba374830d6e.html;

http://www.iowafarmertoday.com/news/crop/farmer-plays-part-in-strict-roll-out-of-new-weed/article_cf64b860-6f8d-11e6-95aa-67d52cca3cc9.html (last visited Aug. 23, 2017).

43.     Despite Defendant Monsanto's false claims about the test plots, numerous surrounding farmers at the time were damaged by Defendant Monsanto's product moving off-target.  Thus, Defendants knew – in 2016 – their products were volatilizing and drifting, but consistently lied about and concealed the damage caused to innocent third-party landowners even under the tightly controlled conditions of the test fields.

44.     In 2017, the only dicamba-based herbicides registered for in-crop use with Xtend seeds were Defendant Monsanto's XtendiMax, Defendant BASF's Engenia, and E. I. Du Pont De Nemours and Company's ("DuPont") FeXapan Herbicide Plus VaporGrip ("FeXapan").

45.     FeXapan is sold by DuPont.  DuPont and Defendant Monsanto have a multi-year licensing and distribution agreement that allows DuPont to source XtendiMax from Defendant Monsanto and sell it as FeXapan.  XtendiMax and FeXapan are the same herbicides.

46.     At all times relevant to this Complaint, Plaintiffs refer to the Defendants' unsafe XtendiMax and Engenia herbicides, not DuPont's.  Any defect with DuPont's FeXapan herbicide is attributable to Defendant Monsanto because DuPont is merely a licensed distributor of Defendant Monsanto's defective technology, selling it under the brand name, FeXapan.

47.     Defendants claim their new dicamba herbicides are lower volatility formulations of dicamba that will greatly minimize, but not entirely eliminate, volatility and drift.

48.     Robb Fraley, Defendant Monsanto's Chief Technology Officer, claims there is a 100-fold reduction in volatility for XtendiMax and Engenia compared to older dicamba formulations.  *See* http://www.indianaprairiefarmer.com/crop-protection/monsanto-officials-add-their-perspective-dicamba-issues-season (last visited Aug. 21, 2017).  These claims, however, have been soundly rejected and disproved by weed scientists across the country.

### C.     Conditional Approval of XtendiMax and Engenia

49.     On November 9, 2016, Defendant Monsanto received a two-year, conditional approval from the EPA for XtendiMax, a dicamba-based herbicide that is identical to Defendant BASF's Clarity herbicide with an additive called VaporGrip.

50.     On December 21, 2016, Defendant BASF's Engenia herbicide also received a two-year, conditional approval from the EPA.

51.     The typical EPA registration period for herbicides is 20 years.  *See* http://www.reuters.com/article/us-usa-pesticides-dicamba-insight-idUSKBN1AP0DN (last visited Aug. 16, 2017).  The EPA may register pesticides conditionally when there are outstanding data requirements or under other circumstances.  During this conditional registration, if Defendants do not comply with the conditions, the EPA may cancel their registrations.

52.     While there were strong requests from some to classify Defendants' herbicides as

restricted use, requests that Defendants vehemently opposed, the EPA did not classify Defendants' herbicides as such.

53.     The EPA does not consider damage to non-target crops, like Plaintiffs' crops, when it considers whether an herbicide should be classified for restricted use.  A classification for "restricted use" restricts a product, or its uses, to use by a certified applicator or under a certified applicator's direct supervision.  *See* https://www.epa.gov/pesticide-worker-safety/restricted-use-products-rup-report (last visited Aug. 23, 2017).

54.     Prior to receiving EPA approval for XtendiMax and Engenia, Defendants withheld pivotal information from the EPA that might have prevented approval of their herbicides' labels.

55.     Defendants conspired to strategically withhold key information on dicamba's volatility from the EPA, only provided the EPA with their own misleading company data, and refused to allow independent, unbiased, more intensive testing on volatility by university researchers prior to commercialization.  *See* http://www.reuters.com/article/us-usa-pesticides-dicamba-insight-idUSKBN1AP0DN (last visited Aug. 23, 2017).

56.     As a result of Defendants' efforts to provide the EPA with an incomplete picture of their herbicides' safety and volatility, the EPA approved Defendants' herbicides, ultimately resulting in the immense damage to non-DT crops in 2017.  This damage will continue to occur unless or until Defendants' defective dicamba-based products are pulled off the market.

57.     Roundup Xtend, Defendant Monsanto's allegedly low-volatility herbicide premix of XtendiMax and glyphosate remains unapproved by the EPA.

**D.     Dicamba Damage Continues in 2017**

58.     In 2017, the dicamba problem did not end with the availability of Defendants' dicamba herbicides.

59. Concerns about the safety and efficacy of Defendants' dicamba herbicides resulted in calls from scientists, agronomists, and others in the agricultural scientific community for more research before and after gaining EPA approval.

60. In 2017, damage caused by the use of Defendants' dicamba herbicides far surpassed the damage caused by older, allegedly more volatile dicamba formulations that occurred in 2015 and 2016. As farmers and state agencies quickly realized Defendants' dicamba products cannot be used safely on Xtend crops, bans and restrictions on the use of these and older dicamba herbicides have occurred in several states.

61. Thus, farmers in across the Midwest, including Plaintiffs, have been victimized by Defendants' greed through the coordinated release of their unsafe and defective dicamba products.

62. Defendants' new dicamba herbicides have volatilized and drifted across thousands of acres of farmland in Southeast Missouri, causing unprecedented damage, including damage to every acre of Plaintiffs' peach orchards, agricultural crops, specialty crops, vegetation, and timber.

63. Defendant Monsanto violated standard industry practice and legal standards by releasing Xtend seeds without a safe, non-defective herbicide on the market.

64. Defendants both violated standard industry practice and legal standards by releasing their defective, unsafe dicamba-based herbicides without proper testing and training.

65. Because both Defendants knew XtendiMax and Engenia would volatilize and move off-target, threatening to disrupt Defendants' scheme, Defendant Monsanto willfully refused to allow proper testing of its herbicide by university researchers.

66. Defendants also conspired to withhold accurate and complete data from their test results on volatility from federal and state agencies, failed to adequately train farmers and applicators for their use, and concealed this information from government regulators, weed

12

scientists, distributors, licensees, farmers, applicators, and the general public.

67.    As for the target of their sales, Defendants set their sights on Southeast Missouri and Northeast Arkansas.  Southeast Missouri is a unique farming environment.  The same geography and weather that makes Southeast Missouri a heaven for cotton, soybean, peaches, among other crops, also makes the area, the Bootheel in particular, especially vulnerable to herbicide volatilization and off-target movement – and Defendants knew this.

68.    In Missouri, there have been almost 500 official dicamba damage complaints since Defendant Monsanto launched its unsafe and defective Xtend crop system in 2015.  Many more incidents of dicamba damage go unreported by farmers.

69.    Farmers in other states have also complained of dicamba damage.

70.    Plaintiffs' crops are not resistant to dicamba, and their crops have been severely damaged by dicamba due to neighboring farmers and applicators who sprayed dicamba, including Defendants' XtendiMax and Engenia herbicides, over-the-top of Xtend crops.

### E.    Plaintiffs Representative Damages

71.    Plaintiff Jerry Franks has a family-owned farming operation in Dunklin County, squarely within Southeast Missouri and the epicenter of the dicamba drift complaints in Missouri.

72.    Plaintiffs Jerry Franks is a farmer who grows soybeans on approximately 230 acres that he owns.

73.    Plaintiff Jerry Franks has been farming for decades in southeast Missouri.

74.    The damages suffered by Plaintiff Jerry Franks due to Defendants' actions, as described in this Complaint, are typical of the damages experienced by all Plaintiffs.

### F.    Defendant Monsanto and Defendant BASF

75.    Defendant Monsanto, a global agrochemical and agricultural biotechnology

corporation headquartered in St. Louis, Missouri, was one of the first companies to apply biotechnology industry models to agriculture. Defendant Monsanto is most widely known for being the leading producer of GM seeds and herbicides, such as Roundup, but has also promoted other agricultural changes and biotechnological trait products.

76. Defendant BASF is the largest affiliate of BASF SE and is the second largest producer and marketer of chemicals and related products in North America. In addition to Engenia, Defendant BASF manufactures several other dicamba herbicides, including Banvel, Clarity, Distinct, Marksman, and Status.

77. Defendants have an established research, development, and marketing collaboration to develop and sell weed control products, including DT seeds and dicamba herbicides.

78. In early 2009, Defendant Monsanto partnered with Defendant BASF and agreed to a joint licensing agreement to accelerate the development of dicamba-based weed control products – resulting in XtendiMax, FeXapan (XtendiMax sold by DuPont under another name), and Engenia.

79. Through their partnership, shared technologies, and mutual greed, Defendants have conspired to create and encourage an ecological disaster in Missouri and other states to increase the profits and demand for their dicamba products.

Defendants are jointly and severally liable for all damages to Plaintiffs.

### G.    A Brief History of Roundup

80. In the 1960s, Monsanto was still not a major player in the agricultural industry and was widely known as a major producer of dioxin-laced Agent Orange.

81. In 1970, that all changed when Monsanto discovered the chemical properties of

glyphosate, currently the company's flagship herbicide, and began marketing it in products in 1974.

82.     Glyphosate is the main ingredient in Roundup, and is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.

83.     A non-selective herbicide tries to kill most plants while a selective herbicide is designed to kill specific types of plants, usually grasses or broad leaf weeds.

84.     For more than 40 years, Roundup has been manufactured, sold, and distributed by Monsanto to farmers all over the world.  Roundup is registered in one hundred thirty countries and is approved for use on over one hundred crops.

85.     Because Monsanto's Roundup products are ubiquitous, Roundup has become a household name.  Roundup is the most heavily-used agricultural chemical in the history of the world.

86.     The success of Roundup is key to Monsanto's dominance in the seed and herbicide marketplace.

87.     From the outset, Monsanto marketed Roundup as a safe herbicide for widespread commercial and consumer use, deemed to pose no unreasonable risk of harm to the environment or human health.

88.     Monsanto's marketing claims regarding Roundup's safety have not been without contention and in recent years have come under fire.  In March 2015, the World Health Organization ("WHO") announced findings that glyphosate is "probably carcinogenic to humans."

**H.     The Rise of GM Seeds**

89.     An important factor in Monsanto's and Roundup's ascension during the 1990s was the development and launch of its GM corn and soybean seeds in 1996, sold under the brand name,

Roundup Ready. Because Roundup Ready seeds are genetically modified to resist glyphosate, farmers could use Roundup to kill unwanted weeds without damaging their GM crops.

90.    By the year 2000, Roundup Ready seeds were planted on more than 80 million acres worldwide and nearly seventy percent of American soybeans were planted from Roundup Ready seeds.

91.    As the sales for Roundup Ready seeds proliferated, the sales for Roundup soared, accounting for almost $2.8 billion in 2000.

92.    As of 2015, Monsanto is the largest seed and herbicide supplier in the world with over $11.8 billion in yearly sales and a market valuation of $55.7 billion.

I.    **The Emergence of Super Weeds**

93.    Due to the agriculture industry's over-reliance on glyphosate-tolerant crops, the constant spraying of Roundup and other herbicides on GM crops has led weed species to develop naturally-evolved resistances, causing the emergence of what weed scientists call "super weeds."

94.    Weed resistance is not a novel problem. Nearly all fifty states have experienced some form, if not multiple forms of herbicide-resistant weeds. *See* http://www.weedscience.com/Vmap/StateMap.aspx (last visited Jan. 18, 2017).

95.    Throughout the 1990s to the present day, ever-increasing weed species have shown resistance to herbicides such as glyphosate.

96.    Ecologists call this the "pesticide treadmill," where weeds evolve to resist the chemicals designed to destroy them, forcing farmers to apply ever-higher doses or use a different pesticide. This also forces herbicide producers to invent new herbicides to kill super weeds or reinvent new uses for older, more dangerous herbicides.

97.    As a direct result over seventy million acres of land in the United States contained

Roundup-resistant weeds by of 2015.

98.     In the U.S., where approximately ninety percent or more of all cotton, soybean, and corn crops consist of glyphosate-tolerant varieties, the acreage of farmland overrun with glyphosate-resistant weeds almost doubled between 2010 and 2012, from 32.6 million acres to 61.2 million acres.

99.     With the introduction of glyphosate-tolerant crops, the pattern of weed control has also changed from predominantly pre-plant applications of herbicides to mostly post-plant and in-season application practices.  This transformation has made herbicide drift and volatilization major concerns to crop producers of all kinds.

100.     Because of the indiscriminate use of herbicides, super weeds are rampant, particularly where Palmer amaranth and waterhemp are significant problems.

101.     Dr. Tom Barber, a University of Arkansas weed scientist, identified 2016 as one of the worst years for Palmer amaranth in recent memory.

102.     Despite the causal link between Monsanto's Roundup products and the pervasive super weeds, Defendants have done nothing to address this agricultural tsunami, but rather has continued to reap billions of dollars in profits from it.

**J.     Dicamba's Role**

103.     Dicamba has been on the market since 1967, first sold by Defendant BASF under the brand name, Banvel.

104.     Dicamba is a broad-spectrum, synthetic auxin herbicide that kills broad-leafed weeds, as opposed to eradicating plants in the grass family.

105.     Dicamba kills weeds before and after they sprout by increasing a plant's growth rate so the plant outgrows its nutrient supply and dies.

106. Dicamba is therefore extremely toxic to virtually all broadleaf plants (plants that are not grasses), such as fruits, nuts, vegetables, and is especially toxic to cotton and soybeans. These crops are very sensitive to ultra-low rates of dicamba.

107. By its very nature, dicamba is a supplemental herbicide, not a foundation herbicide.

108. Dicamba's volatility, its off-target movement, and the resulting injury to sensitive crops have historically constrained its use.

109. The volatility of dicamba has been proven by various, reputable weed scientists in the U.S. According to Dr. Aaron Hager, a professor of crop sciences at the University of Illinois Extension, all formulations of dicamba available for commercial use are volatile, including Defendants' XtendiMax and Engenia herbicides. There is no such thing as non-volatile dicamba. *See* http://bulletin.ipm.illinois.edu/?p=3942 (last visited Aug. 17, 2017).

110. The volatility and off-target movement of dicamba increases when dicamba is sprayed during what is known as a temperature inversion.

111. Normally, the air temperature at the soil level is warm and the air gets cooler further from the surface. In a temperature inversion, this condition inverts – the air temperature is cooler at the soil level, and if a farmer sprays dicamba at this time, such as at dusk or early morning when there is minimal wind and dew or low-lying fog are present in a field, the fine spray particles of dicamba, i.e., "fines", do not fall to the ground. Instead, the "fines" hang in a suspended mass of cool air for hours, even overnight.

112. The dicamba trapped in this cool air mass can travel many miles away from its spray site. After the inversion layer travels a great distance, it then warms again as the earth's surface warms and the dicamba particles fall out of suspension and drop on crops or fields below, causing injury to non-DT crops. *See* http://news.utcrops.com/2017/07/volatility-temperature-

inversion/ (last visited Aug. 17, 2017).

113.    A wind speed of one half mile per hour is enough to move an air mass full of suspended dicamba particles for distances of many miles.

114.    As weed scientists are learning, however, the off-target movement of dicamba is not limited to spray particles being trapped and moved in the air mass during a temperature inversion.  Volatile dicamba gas is also collecting and moving during inversion conditions and causing damage in a landscape effect, i.e., a uniform pattern of damage to crops in an entire field or area.    *See*    http://www.deltafarmpress.com/soybeans/baldwin-understanding-herbicide-volatility-during-inversion-conditions (last visited Aug. 19, 2017).

115.    As accurately stated by Dr. Ford Baldwin, Professor Emeritus at the University of Arkansas and a partner at Practical Weed Consultants, in a *Delta Farm Press* article dated August 17, 2017:

> Common logic along with our understanding about long distance transport of pesticides in stable air told us the only way we could be getting the landscape effect we are seeing with dicamba is through movement in temperature inversions. Common logic also told us there had to be more than just spray particles being trapped in inversions when the herbicides are restricted to ground application and ultra-coarse nozzles. The results from studies like these now confirms the logic that it is volatiles trapped in the inversions causing the landscape dicamba damage.

*See*   http://www.deltafarmpress.com/weeds/baldwin-latest-dicamba-research-and-new-task-force (last visited Aug. 22, 2017).

116.    Dr. Baldwin is not alone in his assessment that volatility is dicamba's fatal flaw. Dr. Kevin Bradley, a weed scientist at the University of Missouri, along with many other weed scientists, are convinced that volatility occurs with Defendants' new dicamba herbicides.  Dr. Bradley also identifies whole fields planted with non-DT seeds that have been damaged by dicamba.    "We've seen a lot of that," Dr. Bradley stated.    *See*

http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html (last visited Aug. 22, 2017.

117.    Further, this type of uniform damage to crops is proof that the damage caused by Defendants' XtendiMax and Engenia herbicides is a result of volatility, not the myriad causes offered by Defendants.    *See*  http://www.deltafarmpress.com/herbicide/baldwin-what-causes-large-acreage-dicamba-damage (last visited Aug. 19, 2017).

118.    Dicamba can also move on dust particles on roads running through treated fields. These particles can move from roads and field edges onto non-DT crops, causing injury.

119.    According to Dr. Ford Baldwin, the damage to crops from volatility is not limited to older formulations.   "The labeled formulations are less volatile but not non-volatile," Dr. Baldwin stated.  *See id.*

120.    Because dicamba, in all its forms, has a propensity to drift due to volatility, temperature inversions, and other causes, immense and widespread damage has occurred and will continue to occur to Plaintiffs' crops when other farmers spray Defendants' dicamba herbicides over-the-top of Xtend crops.

### K.    Defendants' Incomplete Perspective on the Use of Dicamba

121.    According to Defendant Monsanto, dicamba has an alleged decades-long history of effective use in corn, wheat, fallow, and pasture land in the U.S.    *See* http://news.monsanto.com/press-release/corporate/monsanto-and-dupont-sign-dicamba-supply-agreement (last visited Aug. 17, 2017).

122.    Prior to 2017, dicamba was actually used very little in American agriculture because of its volatile nature.  According to data reported by Defendant Monsanto, only 3.8 million pounds of dicamba were applied to 25.3 million acres in 2011, representing just 0.9% of total

agricultural herbicide use in 2007 and 6.5% of total cropland area of 390 million acres in 2012.

*See* http://www.centerforfoodsafety.org/files/cfs-dicamba-cotton-and-soy-deis-science-comments-i_21022.pdf at p. 5 (last visited Aug. 20, 2017).

123.   Yet dicamba herbicides continue to be sold in the U.S. by several manufacturers under a variety of older and generic formulations, as well as several dicamba herbicides sold and marketed by Defendant BASF, including Banvel, Clarity, Distinct, Marksman, and Status.

124.   Currently, Defendant BASF is the largest seller of dicamba herbicides in the U.S. *See* http://www.intlcorn.com/seedsiteblog/?p=847 (last visited Aug. 22, 2017).

125.   Defendant BASF claims its Clarity herbicide is eight times less volatile than generic dicamba products.   *See*   http://agproducts.basf.us/products/research-library/clarity-brochure.pdf (last visited Aug. 22, 2017).

126.   As early as 2005, Defendant Monsanto licensed the dicamba resistance gene from the University of Nebraska.

127.   In doing so, Defendant Monsanto sought to prolong the usefulness of its Roundup crop system with dicamba, an active ingredient in XtendiMax and Roundup Xtend.   With Defendant BASF's cooperation and partnership, the two companies began diligently developing a new crop system featuring dicamba.

128.   Several noted weed scientists have attested to Roundup's failure to control Southeast Missouri's aggressive pigweeds and herbicide-resistant weeds.   As correctly stated by Dr. Tom Barber in a report published on the University of Arkansas Cooperative Extension Program's website on July 15, 2016, "Roundup no longer controls pigweed."   *See* https://www.uaex.edu/media-resources/news/july2016/07-15-2016-Ark-dicamba-drift-injuries.aspx (last visited Aug. 16, 2017).

129.     With Defendant Monsanto's Roundup Ready corn, soy, and cotton losing the battle of the increasing infestation of glyphosate-resistant weeds in Southeast Missouri, Defendant Monsanto rushed to release its dicamba-resistant Xtend seeds.  Defendant Monsanto did this in order to renew its stranglehold on the weed control market, which would foster its scheme with Defendant BASF as well.  Worse, Defendant Monsanto did so despite having previously said it would not release Xtend seeds without an accompanying, approved, and safe herbicide.

130.     In anticipation of the profits it will reap from dicamba, Defendant Monsanto has invested $2 billion toward its dicamba scheme – over one billion dollars producing its new dicamba formula and another $1 billion to upgrade a dicamba manufacturing plant in Luling, Louisiana.

131.     In 2015 and 2016, Defendants counted on farmers to rapidly adopt Defendant Monsanto's Xtend crops, which would boost earnings in its seed and pesticide units, and Defendants proactively encouraged the sale of Xtend seeds.

132.     In 2016, Defendant Monsanto sold about three million acres of Xtend cotton and one million acres of Xtend soybeans.

133.     In 2017, Defendant Monsanto exceeded its expectations for Xtend seed sales, as farmers in the U.S. have planted twenty million acres of Xtend soybeans and five million acres of Xtend cotton.

134.     Defendant Monsanto projects that by 2019, two-thirds of all U.S. soybean fields will be planted with Xtend seeds.  *See* https://www.wsj.com/articles/grain-traders-rejecting-new-soybeans-developed-by-monsanto-1462217040 (last visited Aug. 17, 2017).

135.     As dicamba-resistance is added to other crops, Defendant Monsanto's Xtend seeds will eventually cover at least two hundred fifty million acres in the U.S.

136.     Defendants' reckless and negligent behavior has placed farmers in a no-win

situation. With all the dicamba being sprayed on Xtend crops in Southeast Missouri since 2015, soybean and cotton farmers who do not grow Xtend soybeans or cotton are being forced to purchase Defendants' products out of self-preservation.

137. Cotton and soybean farmers have lost their freedom to choose. As Dr. Tom Barber stated when discussing how farmers are being forced to purchase Xtend seeds to protect themselves, "They're afraid that they're not going to be able to grow what they want to grow. They're afraid that they're going to be forced to go with that technology." *See* http://www.npr.org/sections/thesalt/2016/08/01/487809643/crime-in-the-fields-how-monsanto-and-scofflaw-farmers-hurt-soybeans-in-arkansas (last visited Jan. 22, 2017).

138. In 2017, the sheer amount of Xtend seeds planted in Southeast Missouri played a primary role in the dicamba dilemma, and the numbers do not lie. According to Dr. Kevin Bradley, 80% of the cotton and 65% of the soybeans in the Bootheel were planted using Xtend seeds and nearly all of it was sprayed with dicamba. *See* http://www.hpj.com/rich/dicamba-complaints-are-sprouting-like-weeds/article_4513c642-67fd-11e7-9085-97102969d2f9.html (last visited Aug. 17, 2017).

139. Dr. Bob Hartzler, a weed scientist at Iowa State University, echoed Dr. Bradley's findings in a blog post on the Iowa State University Extension and Outreach's website on July 13, 2017, stating that the percentage of acreage planted with Xtend seeds in Dunklin County, Missouri could be even higher, upwards of 80%. *See* https://crops.extension.iastate.edu/blog/bob-hartzler/thoughts-dicamba-dilemma (last visited Aug. 17, 2017).

## L.  Defendants' Efforts to Gain Regulatory Approval

140. For Defendants' scheme to be successful, Defendants needed to encourage the sale of Xtend seeds. The more Xtend seeds Defendant Monsanto sold, the more Defendant BASF's

older formulations of dicamba would be used on those seeds, thereby increasing the pre-label approval profits for both Defendants.

141. Likewise, Defendants shared a mutual interest in the creation of their dicamba products and registering them for approval by the United States Department of Agriculture ("USDA") and the EPA.

142. The partnership and licensing agreements Defendants share span many years and share borrowed technologies. For instance, Defendant Monsanto's XtendiMax is the same dicamba formulation as Defendant BASF's Clarity herbicide, only with an extra additive called VaporGrip. *See* http://agfaxweedsolutions.com/2016/12/07/dicamba-4-formulation-choices-fight-herbicide-resistant-weeds/ (last visited Aug. 17, 2017).

143. Further, Defendant BASF is a longstanding producer of dicamba herbicides and by sharing its technologies and formulas with Defendant Monsanto, Defendants shortened the timeline for their dicamba products to reach the market.

144. At least as early as 2009, Defendants formed a partnership and agreed to a joint licensing agreement to fast-track their dicamba products to market.

145. In April 2010, Defendant Monsanto made its first submission to the EPA to register dicamba to use the herbicide with GM soybeans.

146. In July 2010, Defendant Monsanto announced it had recently completed its regulatory submission to the USDA to deregulate its DT soybeans. According to Defendant Monsanto's announcement:

> Dicamba is an ideal tank-mixing partner for Roundup® agricultural herbicides for both pre-plant and post-emergence weed control . . . Dicamba is an economical herbicide that provides excellent control for a wide spectrum of broadleaf weeds and ideally complements Roundup agricultural herbicides to provide another step change in soybean weed control. This new technology would provide soybean

farmers another low-cost weed management solution through the use of glyphosate, dicamba, or combinations of both.

147.    Defendant Monsanto's statements received early and sustained criticism from industry experts.  On September 30, 2010, Steve Smith, Director of Agriculture for Red Gold, the largest privately-held canned tomato processor in the U.S., and Chairman of the Save Our Crops Coalition ("SOCC"), testified before Congress about the distribution of dicamba-resistant soybeans in the Midwest.  In his testimony, Mr. Smith stated his conviction, based on a lifetime of work and education in the agriculture industry, that widespread use of dicamba is the single most significant threat to specialty crops in the Midwest and would be incompatible with Midwestern agriculture.    *See*    https://oversight.house.gov/wp-content/uploads/2012/01/20100930Smith.pdf (last visited Aug. 18, 2017).

148.    Mr. Smith also testified as to why dicamba is not a foundation herbicide, stating, "The answer is simple.  Dicamba has proven itself to move off-target and cause injury and yield reductions to soybeans and so in a large sense, it is rarely used."  *See id.*

149.    Further, Mr. Smith emphasized the volatility risk of dicamba, stating the newest formulations are proven to move off-target.  He also told Congress how farmers who spray dicamba are in a no-win situation.  If the wind is slight on a hot and humid day and a farmer sprays dicamba, dicamba may have less drift propensity, but the volatility of dicamba skyrockets under those conditions.  Mr. Smith stated, "The science is clear and settled in regard to dicamba's susceptibility to off-target movement due to volatility."  *See id.*  His warning proved prescient.

150.    In November 2010, Defendants proceeded with the development of their dicamba products and jointly announced they had recently completed field-testing of their dicamba-based herbicides.  In these tests, Defendants' dicamba herbicides were applied over-the-top of Defendant Monsanto's Xtend seeds at Defendant Monsanto's research facility in Monmouth, Illinois.

151.    By 2012, weed scientists, agronomic crop growers, and specialty crop growers began warning consumers and growers alike of dangers of dicamba-resistant crops and dicamba herbicides, including dicamba's volatility and propensity to move off-target onto sensitive, neighboring crops, and how dicamba use will accelerate the evolution of super weeds.  Defendants knew about these reports.  *See* https://www.extension.purdue.edu/extmedia/id/id-453-w.pdf (last visited Aug. 17, 2017); http://www.intlcorn.com/seedsiteblog/?p=847 (last visited Aug. 17, 2017).

152.    Throughout 2012, weed scientists questioned the use of dicamba over-the-top on Xtend seeds.  In an article titled, "2,4-D and Dicamba-resistant Crops and Their Implications for Susceptible Non-target Crops" published on the Michigan State University Extension's website, Dr. David Mortenson, a weed scientist at Penn State University, stated that "plant injury was 75 to 400 times higher for dicamba and 2,4-D, respectively, than for glyphosate."  *See* http://msue.anr.msu.edu/news/24_d_and_dicamba_resistant_crops_and_their_implications_for_susceptible_non (last visited Aug. 19, 2017).

153.    Again in 2012, despite their knowledge of the risks of using dicamba herbicides over-the-top, Defendants submitted petitions to the EPA to register their dicamba herbicides, with Defendant Monsanto submitting its petition to register dicamba for in-crop use with cotton and Defendant BASF submitting a petition to register Engenia.

154.    In 2013, Defendant Monsanto submitted its application to deregulate dicamba for use with GM cotton.

155.    Also in 2013, industry experts, such Steve Smith of SOCC and Red Gold met with Defendants to express concerns about dicamba's volatility and danger.  Defendants knew of the risks, dangers, and industry problems associated with their dicamba products from these meetings,

yet they continued to suppress their knowledge of dicamba's risks from federal and state agencies and consumers.

156.    During these meetings, Steve Smith also proposed changes to the labels for Defendants' dicamba herbicides.  Nothing came of it, as Defendants had no interest in altering their scheme to dominate the GM seed and herbicide market with their dicamba products.  As accurately stated by Steve Smith to *USA Today* on March 13, 2014, "[i]t became real apparent that they were intent on not making any changes."  *See* https://www.usatoday.com/story/news/nation/2014/03/13/monsanto-dow-agrosciences-herbicides-save-our-crops/6015519/ (last visited Aug. 18, 2017).

157.    In the same *USA Today* article, Mr. Smith said Defendant Monsanto's proposed label restrictions were woefully inadequate and Defendant Monsanto was unwilling to constructively address the "very real" threats faced by growers.  *See id.*

158.    In 2014, despite Defendants' efforts to rush their products onto the market, industry experts again issued warnings about the obvious dangers of dicamba crop systems.  In a statement dated February 19, 2014, Steve Smith stated:

> Unfortunately, Monsanto and BASF have, so far, chosen not to act [responsibly].  SOCC wants to make clear that there remain several points of contention with Monsanto and BASF that are unlikely to be resolved through simply learning more about their products.  Our differences with Monsanto and BASF are especially stark with respect to the use of older, more volatile, forms of dicamba, and product stewardship.  **Moreover, unlike 2,4-D, many food crops have no tolerance or exemption for dicamba residues.  Unfortunately, Monsanto and BASF have yet to implement effective measures to protect against non-target plant damage**.

*See*   http://saveourcrops.org/2014/02/19/socc-corrects-the-record-regarding-24-d/   (last   visited Aug. 18, 2017) (emphasis added).

159.    In addition to Mr. Smith's statement about Defendants' failure to cooperate with

anyone at odds with their collaborative scheme to create and profit from a dicamba disaster, Mr. Smith also sent a letter to Thomas Vilsack, Secretary of Agriculture for the USDA. In his letter, Mr. Smith detailed his frustrations with Defendants' complete lack of desire to make their products safe:

> For instance, just from a review of publically [sic] available sources, we know our differences with Monsanto and BASF are especially stark with respect to the use of so-called 'generic' forms of dicamba. Monsanto has sought the registration for its older, more volatile Clarity formulation, and failed to mention the availability of the lower volatility Engenia formulation within its publically [sic] available petition documents. Our differences are also stark with respect to product stewardship. Monsanto has not publicly presented any strategy to mitigate adverse environmental effects of either herbicide, through label language, through limitations on application timing, or through the competitive pricing of lower volatility formulations. Monsanto has also not proposed recordkeeping practices to ensure that applicators are aware and have documented application location, timing, and windspeed, before applicators use dicamba. Moreover, unlike 2,4-D, many food crops have no tolerance or exemption for dicamba residues. Because a commodity containing residues without a tolerance or an exemption is prohibited from passing in interstate commerce, SOCC is very concerned that, without an exemption or tolerance, even trace residues would render crops unmarketable, even if those crops are safe. In short, SOCC still regards dicamba tolerant crops as highly likely to have significant non-target plant damage effects on broadleaf specialty crops, because Monsanto has yet to implement effective measures to protect against non-target plant damage.

*See* http://saveourcrops.org/wp-content/uploads/2014/02/FINAL-SOCC-Letter-to-the-Secretary-EIS-022012.pdf (last visited Aug. 18, 2017).

160.    Despite these clear warnings of dicamba's danger, in June 2014, Defendant BASF announced plans to boost production of its dicamba weed-killers by 50% to keep pace with anticipated demand should Defendant Monsanto receive regulatory approval to sell its Xtend seeds.

161.    Six months later, in January 2015, Defendant BASF's plan paid off when the USDA announced its decision to deregulate Defendant Monsanto's Xtend crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

162. In April 2016, in a move strikingly similar to Defendant BASF's announcement to boost its dicamba production, Defendant Monsanto announced plans for a $975 million expansion of its chemical manufacturing facility in Luling, Louisiana.

163. The Luling facility will produce dicamba for Defendant Monsanto's Xtend crop system with expectations to supply more than one-third of the eventual market demand for dicamba-based products. The plant is expected to open between 2019 and 2021, coinciding with the time when Defendant Monsanto expects Xtend seeds to cover two-thirds of cropland in the U.S.

**M.      Dicamba Herbicides Approved – Defendants' Conspiracy Complete**

164. With Defendants' conspiracy in progress and Defendant Monsanto's Xtend seeds already on the market, Defendants still lacked approval for their new dicamba-based herbicides.

165. On November 9, 2016, Defendant Monsanto received EPA approval for XtendiMax, making it available for the 2017 growing season.

166. On December 21, 2016, Defendant BASF secured EPA approval for its dicamba herbicide, Engenia, for use on DT soybeans and cotton, making Engenia available for the 2017 growing season.

167. In order to receive these approvals, however, Defendants knowingly suppressed damaging data about their own research. In a bold and deceptive move, Defendant Monsanto provided samples of its dicamba herbicides to university researchers prior the herbicides receiving EPA approval, but required these researchers to sign contracts that forbade them from testing for volatility. *See* http://www.reuters.com/article/us-usa-pesticides-dicamba-insight-idUSKBN1AP0DN (last visited Aug. 22, 2017).

168. This data could have provided the EPA with a complete picture of Defendants'

herbicides' safety. Defendant Monsanto's refusal to allow such testing prevented the real dangers and risks of its dicamba herbicide from becoming public knowledge.

169. Defendant Monsanto's Vice President of Global Strategy, Scott Partridge, claimed the company prevented all testing for volatility because it was unnecessary. *See id.*

170. Further, on or about August 8, 2016, in a meeting before the Arkansas State Plant Board, Dr. Boyd Carey, a representative for Defendant Monsanto, stated that no outside university or independent researcher was allowed to test XtendiMax for volatility and drift because the results of the tests could jeopardize the federal registration that Defendant Monsanto needed from the EPA to sell its herbicide. *See id.*

171. Yet Defendants knew about these dangers from the countless state agency hearings and meetings they attended on the subject of their dicamba products since 2013, as well as from their own scientists who, behind closed doors, were warning company executives that these new formulations were extremely volatile and would cause massive destruction to non-DT crops.

172. Defendants knew their XtendiMax and Engenia herbicides were volatile, unsafe, defective, and unreasonably dangerous, yet they placed them on the market anyway.

173. Defendants created demand for the Xtend crop system in order to jump-start a billion-dollar profit center. By prematurely releasing the Xtend seeds in 2015, priced at a five dollar to ten dollar per acre premium, and by claiming greater yields, Defendants created initial buzz for the Xtend crop system, causing Defendant Monsanto to reap between $15 million and $30 million in first-year sales alone.

174. Ironically, the damage caused by off-label dicamba spraying on Xtend seeds caused the sale of those same seeds to skyrocket in what amounts to a modern-day agricultural protection racket.

175.    Unless something is done to stop them, now that Defendants' conspiracy is complete, the vast majority of soybean and cotton farmers will be forced to purchase Defendants' dicamba products, which was Defendants' plan all along.  Defendant Monsanto expects its profits for Xtend seeds alone will reach $1.25 billion to $2.5 billion dollars annually, to say nothing of either Defendants' herbicide sales.

176.    Many farmers contacted Defendant Monsanto to voice complaints about dicamba damage to their crops in 2015 and 2016, further putting Defendant on notice.  These farmers were ignored.

177.    The more Defendants' dicamba products (Xtend seeds and older dicamba formulations) sold in 2015 and 2016, the more fear arose in farmers under drastic weed pressure who saw no choice but to purchase Defendants' dicamba products or else face immense reductions in yields and lost crops.

178.    For example, in an August 15, 2014 meeting before the Arkansas State Plant Board, Kim Magin, Defendant Monsanto's Director of Industry Affairs, stated to the Plant Board that while farmers are not required to spray dicamba on Xtend crops, most seed production activities would spray dicamba.

179.    These remarks and Defendants actions show that Defendants systematically conspired to create an ecological disaster for profit in the agricultural communities across the country.

### N.    The Sale and Distribution of Xtend Cotton in 2015

180.    Defendants' intentional, reckless, and negligent behavior has caused great financial harm to Plaintiffs on account of their irresponsible and premature release of their products.  The first instance occurred in 2015 when Defendant Monsanto released its Xtend cotton.

181.    This release was premature even by Defendant Monsanto's standards.  In a press release dated November 28, 2012, Defendant Monsanto's Chief Technology Officer, Robb Fraley, stated that the company would not release its Xtend crop system until it received EPA approval for its dicamba herbicides, which is standard industry practice.  *See* http://news.monsanto.com/press-release/strong-harvest-results-demonstrate-monsanto-companys-position-industry-yield-leader-ch (last visited Aug. 17, 2017).

182.    On or around January 2015, instead of waiting to secure EPA approval for a dicamba herbicide to pair with its Xtend cotton like a responsible company would, Defendant Monsanto put greed and its quest for endless profits before safety and distributed and sold Xtend cotton in a limited commercial introduction in the U.S., expecting to sell 500,000 acres.

183.    Xtend cotton was initially introduced in Missouri, Arkansas, and Tennessee, and was particularly targeted at Southeast Missouri's cotton country, i.e., Dunklin County, Stoddard County, New Madrid County, and Pemiscot County.

184.    Through its distribution channels, Defendant Monsanto distributed and sold Xtend crops throughout Southeast Missouri to its national distributors, wholesalers, retailers, and other regional and local representatives and agriculture dealers and partners.

185.    Through Defendant Monsanto's distributors, wholesalers, and retailers, Xtend crops were distributed and sold to end-use customers, farmers, industrial users, and government agencies (such as highway departments) in Southeast Missouri.

186.    Xtend cotton is genetically modified to allegedly tolerate exposure to the herbicides dicamba, glyphosate, and glufosinate.

187.    The distribution and sale of Defendant Monsanto's Xtend cotton in 2015 was reckless and negligent, violated standard industry practice, and ushered in a wave of reckless and unreasonably dangerous experimentation in the farming community of Southeast Missouri.

188.    According to researchers at the University of Missouri and the University of Arkansas, it is completely contrary to standard industry practice to release a new seed without the simultaneous availability of a corresponding herbicide – whether that corresponding herbicide already exists or is a new product.

189.    Echoing this fact is Dr. Bob Scott, a weed specialist at the University of Arkansas Extension.  In a *Delta Farm Press* article, Dr. Scott stated, "It's an odd situation because we can't recall a technology like this being released without a corresponding herbicide.  We had Roundup Ready, LibertyLink – none released without a herbicide."  *See* http://www.deltafarmpress.com/soybeans/dicamba-drift-incidents-have-ripple-effect (last visited Aug. 22, 2017).  What's more, the corresponding herbicide must be safe and non-defective in order to avoid injury to innocent third-parties, such as Plaintiffs.

190.    However, Defendant Monsanto sold only one part of the system – Xtend seeds – and failed to provide a safe, accompanying herbicide, knowing full well that no safe, non-defective dicamba herbicide existed, and it still does not.

191.    In 2015 and 2016, even if Defendants released XtendiMax or Engenia with Defendant Monsanto's Xtend seeds, neither XtendiMax nor Engenia would have been safe and non-defective because there is no such thing as non-volatile dicamba herbicide – and Defendants knew this.

192.    The absence of a safe, legal, non-defective dicamba herbicide did not thwart Defendants' goals.  On the contrary, it furthered them and was both a short-term win and a long-

term win for both Defendants.

193.    It was a short-term victory for Defendants because as Defendants conspired to mutually develop their dicamba products for use in a dicamba-based "system," Defendants marketed their products as a "system," and farmers expected to be able to use a "system."

194.    Defendant Monsanto launched its Xtend seeds without providing a safe, accompanying herbicide, knowing that Defendant BASF is one of the manufacturers of older dicamba formulations, like Banvel and Clarity, among others.

195.    The illegal use of these older dicamba herbicides on Xtend crops, which Defendants instructed farmers to use together, resulted in massive damage to non-DT crops in 2015, 2016, and on an on-going basis.  Most importantly, it instilled fear in farmers.

196.    This fear translated into those farmers purchasing Defendants' Xtend seeds and even more dicamba in 2017, giving Defendants a tremendous advantage for the upcoming growing seasons.  These self-defensive farmers are just pawns in Defendants' scheme to seize the market.

197.    The self-defensive farming expanded in part because Defendants conspired to withhold data and mislead federal and state agencies about the volatility of their XtendiMax and Engenia herbicides.  Defendants also marketed their products as safe, non-defective, and far less volatile herbicides, despite their knowledge that this was false.

198.    Defendants knew their dicamba products were equally, if not more volatile than older dicamba formulations.  And the absence of a safe, non-defective herbicide makes the system defective.  As Defendants knew and expected, XtendiMax and Engenia volatilized and moved off-target on a massive scale, causing unprecedented damage to non-DT crops in Missouri.

**(1)    Defendants Encouraged Illegal Spraying**

199.    Not only were Defendants' products dangerous and defective, but their actions

showed a reckless disregard for the rights of farmers with crops that were not dicamba-tolerant. Defendants made it a practice of telling farmers who purchased Xtend seeds to go ahead and spray illegal dicamba formulations on their Xtend crops.

200.    For example, sworn testimony before the Arkansas State Plant Board establishes that the Plant Board sanctioned a Missouri farmer who Defendant Monsanto directed to illegally spray dicamba on his Xtend crops. *See* http://www.arkansasmatters.com/news/local-news/working-4-you-illegal-chemical-use-damages-soybeans-threat-of-spread-outside-ag/521534160 (last visited Jan. 23, 2017).

201.    In this sworn testimony before the Arkansas State Plant Board, Donald E. Masters, a Missouri farmer who has farmland in Dunklin County, Missouri and Northeast Arkansas, testified that a Defendant Monsanto representative told him to spray dicamba on his Xtend crops. Mr. Masters' testimony is as follows:

> MS. NICHOLS: The Committee asked that you come in or required that he come in. I think they have some questions as to why they considered this a grievous and they wanted to know -- from what I understand, why this application was made at this rate.
> MR. HOWE: Exactly right.
> MR. MASTERS: Well, you think I just grabbed it out of the air? You think the boy that just left here just grabbed those figures out of the air and did it. Somebody told him to, right?
> MR. FINCH: Who told you to?
> MR. MASTERS: You know who did. I'm not going to say it.
> MR. FINCH: Monsanto?
> MR. MASTERS: A few words may incriminate myself. Why sure.
> MR. FINCH: So, Monsanto told you to spray this Strut --
> MR. MASTERS: Well --
> MR. FINCH: -- directly over the top and it wouldn't hurt a thing?
> MR. MASTERS: Right. And the cotton is developed and it didn't hurt the cotton one dab, but they told us it would be legal, but you know it's not legal. Now, this is January of '15 that it's not legal right now, but it will be by May at the latest. So, we planted it, we sprayed it, then everybody commenced to saying, "Oh, it's not legal no more. It's not legal." Well, it -- I'm just like the rest of you. I didn't read the writing. Dicamba, I've used it on corn. Clarity, which is a more refined Dicamba that's some of the other. There's two formulations of Dicamba. One, the salts in

them are a little different. And I can't remember exactly what they were, but Clarity is the one that's a little more better to spray over cotton than the other cheaper variety is.

MR. FINCH: But who's your rep?

MR. MASTERS: I'm not going to say, because he was just doing what somebody told him.

MR. FINCH: So Monsanto told him to go out and tell you?

MR. MASTERS: Well, they developed the cotton. They spent a lot of money developing the cotton.

MR. FINCH: I'm sure they did.

MR. MASTERS: And they wanted the seed sold. Now, all Monsanto – that DPL variety had on the sack "Do not spray with Dicamba." Okay?

**MR. FINCH: But this guy told you to spray it?**

**MR. MASTERS: But well – yes**, but there was another company that sold Dicamba cotton that is just a plain sack and didn't say a thing in the world about spraying over the top or anything else.

*See* Ex. 1A – Donald Masters' Testimony Tr. at 10-12 (emphasis added).

202.    So, when asked under oath the direct question whether "this guy" – a Defendant Monsanto representative – told him to spray older dicamba in 2015, Mr. Masters says unequivocally, "Yes."  Mr. Masters' testimony is only one example of a pattern and practice engaged in by Defendants to overtly and covertly encourage and approve the illegal spraying of older dicamba over-the-top of Xtend seeds in 2015 and 2016.

203.    On September 20, 2017, Mr. Masters was deposed in the Bader Farms Case, Case No. 1:16-CV-299 SNLJ, currently pending before this Court.

204.    During his deposition, Mr. Masters conceded that the plant board testimony was his words, but tried to qualify the testimony, claiming the Monsanto representative only told him he "could" spray dicamba over the top in 2015 and 2016, not that he had to spray it.  *See* Ex. 1B – Donald Masters Deposition Testimony at Tr. 121.

205.    Mr. Masters further explained that the Monsanto representative knew Mr. Masters wanted the Xtend seeds so he could spray dicamba on the seed and the representative told him how

much dicamba the seeds would tolerate. *See* Ex. 1B – Donald Masters Deposition Testimony at Tr. 132:09 – 24.

206. In spite of knowing Mr. Masters intended to spray dicamba illegally in 2015, the Monsanto representative did not discourage the behavior. *See* Ex. 1B – Donald Masters Deposition Testimony at Tr. 147:21 – 148:4.

207. This type of illegal spraying in 2015 and 2016 was not only foreseeable to Defendants but also essential to their scheme. To create widespread fear among farmers who had not purchased DT seeds, Defendants' agents engaged in a widespread effort to encourage the illegal spraying. Defendants' agents told users to spray, falsely characterized the legality of the spraying, and assured users that Defendants would take no action against them for the illegal spraying.

208. Further, as discussed in subsequent allegations, Defendants could have revoked its use agreements at any time had they been concerned about illegal, off-label spraying. Yet Defendant Monsanto repeatedly made it clear that no use agreements would be revoked, and indeed, none were.

209. Mr. Masters testified that despite knowledge of his illegal spraying, Monsanto made no effort to investigate, examine his records of spraying, or show any interest at all in his spraying. *See* Ex. 1B – Donald Masters Deposition Testimony at Tr. 146:3 – 147:2; 151:18 – 152:8.

210. By Defendant Monsanto telling farmers to spray older dicamba on Xtend crops in 2015, Defendants ensured that farmers would use both of their products, causing the crisis that ensued, thereby forcing farmers of non-DT crops to purchase Defendants' products in the future. The result would be astronomical profits for Defendants at the expense of defenseless farmers, like Plaintiffs.

211. Donald Masters also made a statement to the Missouri Department of Agriculture Plant Industries Division. In that statement, Mr. Masters admitted he illegally sprayed dicamba over portions of his cotton fields in Arbyrd, Missouri, in May 2015. The bulk of Donald Masters' farm is located in Dunklin County, Missouri.

212. Because XtendiMax and Engenia were not available for use with Xtend crops until November 9, 2016, at the earliest, and because of Defendant Monsanto's representatives telling farmers to spray older, illegal dicamba formulations over-the-top of their Xtend crops, it was inevitable and completely foreseeable that farmers who grew Xtend seeds would, in fact, spray the older dicamba formulations on Xtend crops and damage Plaintiffs' and others' crops.

213. Any instructions, notices, or even warnings, if such existed, that accompanied Defendant Monsanto's dicamba products in 2015 to present were negated by its representatives instructing farmers how to spray older dicamba on Xtend crops.

### (2) Defendants' Labels Fail to Warn About the Danger

214. At all times relevant to this Complaint, Defendants knew their product labels, including the Xtend seeds, were inadequate and did not address the real dangers associated with their products' use. Defendants did not warn farmers of these dangers and failed to train farmers how to avoid using the products in a dangerous and unsafe manner.

215. Further, Defendants' use instructions and notices fail to explain that any application of any dicamba herbicide available on the market in 2015 and 2016 for use with Xtend crops will result in off-target movement of dicamba, causing damage to surrounding crops and vegetation.

216. Defendants made no efforts to warn farmers that the inherent danger of the older dicamba formulations included extreme short-term and long-term volatilization, drift, off-target movement due to temperature inversions, and damage and yield loss to sensitive crops.

## O.    The Sale and Distribution of Xtend Seeds in 2016

217.    Therefore, in 2016, Defendants continued their intentional, reckless, and negligent behavior with Defendant Monsanto's premature release of its Xtend soybeans.

218.    In early January 2016, Defendant Monsanto distributed and sold Xtend soybeans and Xtend cotton in the U.S., including in Missouri, with expectations to corner the soybean market in cooperation with Defendant BASF.

219.    According to a February 2016 press release, Defendant Monsanto boasted that demand for their Xtend soybeans was strong, highly anticipated by farmers, and there were "significant pre-orders from farmers."

220.    As soybeans are the second most widely-grown crop in the U.S. after corn, Defendant Monsanto's ability to dominate the soybean seed market with its Xtend system will result in massive financial gain for both Defendants.

221.    In 2015, Missouri ranked eighth in top soybean producing states.  As with cotton, the top four soybean producing counties were also located in Southeast Missouri: 1) Stoddard County; 2) New Madrid County; 3) Pemiscot County; and 4) Dunklin County.

222.    Xtend soybeans facilitate a wider application window (at planting and in-crop) of dicamba and offer growers an expanded use of dicamba in soybean production into the warm summer months when dicamba is more volatile in higher temperatures.

223.    On February 3, 2016, Defendant Monsanto announced its commercial launch plans for Xtend soybeans after the seed received import approval from China, even though the EPA did not approve XtendiMax for the 2016 growing season.

224.    With respect to an accompanying herbicide,  Kim Magin for Defendant Monsanto, stated to the *Delta Farm Press* on April 15, 2016, "[O]ur best guess is having dicamba formulations

ready for growers is unlikely for this year. We have our fingers crossed that the approval will come as quickly as possible so growers, without further delay, will be able to use this new tool in soybean and cotton production in 2017."

225. However, Defendant Monsanto never told farmers not to plant Xtend crops and never warned farmers, commercial applicators, regulators, state legislatures, Congress, or third-parties who might be harmed about the dangers of dicamba volatilization and drift – the two characteristics that make Defendants' dicamba herbicides unsafe, unreasonably dangerous, and defective.

226. Even though there were numerous issues and concerns surrounding its Xtend crop system in 2016, Defendant Monsanto proceeded with the launch of Xtend soybeans. Now Defendant Monsanto had both its Xtend cotton and soybeans on the market.

227. As was the case with Xtend cotton, Defendants ensured that farmers would spray older dicamba on Xtend soybeans, causing more damage to farmers like Plaintiffs.

228. Thus, during the 2016 growing season in Southeast Missouri, farmers, as instructed by Defendant Monsanto's representatives, predictably and illegally sprayed older, more volatile dicamba herbicides on Xtend soybeans and cotton.

229. Defendant Monsanto estimates that Xtend soybeans were planted across approximately one million acres of farmland in 2016, along with three million acres of Xtend cotton.

230. This rise in Xtend seed sales from 2015 to 2016 not only increased Defendant Monsanto's profits and set the stage for the products' proliferation in 2017, but the sales for Xtend seeds also improved Defendant BASF's herbicide sales for its existing dicamba herbicides, such as Clarity and Banvel.

231.    Defendants concealed their knowledge of the dangers of their products, the damage they would cause, and refused to correct or stop the use of their defective products.

232.    Further, to entice farmers to purchase Xtend seeds and increase both seed demand and the use of Defendant BASF's older dicamba herbicides, Defendant Monsanto lowered the price of its Xtend soybeans.  As a result, Xtend seeds flooded the market, creating the phenomenon of self-defensive farming that emerged in 2017.

233.    Ashley Berthold, a district sales manager for Asgrow, a seed brand distributed by Defendant Monsanto, stated that four hundred units of Xtend soybeans were planted in Missouri in 2016.  This was just enough to cause widespread damage to thousands of acres of non-DT crops, like Plaintiffs' crops, resulting in an increased demand for Defendants' products.

234.    The distribution and sale of Defendant Monsanto's Xtend soybean and cotton seeds in 2016 in Southeast Missouri violated standard industry practice and created a destructive wave of crop loss by a reckless experiment in Southeast Missouri.

235.    Farmers who purchased Xtend soybeans in 2016 did not have access to any safe dicamba herbicide, and thus, it was reasonably foreseeable, indeed inevitable, and expected by Defendants that farmers would substitute older dicamba formulations to protect their crops, furthering Defendants' goal of spurring demand for their products in the next growing season.

236.    With farmers spraying dicamba products available from Defendant BASF, Defendant BASF also did nothing to warn farmers or remove and restrict its products availability for use during a growing season in Missouri that set a then record for dicamba damage, and also increased its dicamba sales.

237.    In August 2016, the EPA issued a Compliance Advisory due to the unusually high number of reports of crop damage related to herbicides containing dicamba.  *See*

https://www.epa.gov/compliance/compliance-advisory-high-number-complaints-related-alleged-misuse-dicamba-raises-concerns (last visited Jan. 18, 2017).

238.     As accurately stated by Dr. Larry Steckel, a weed extension specialist at the University of Tennessee, the weather and growing conditions in the Mid-South, which includes Southeast Missouri, created the perfect storm for dicamba injury to crops. *See* http://www.southeastfarmpress.com/soybeans/perfect-storm-created-dicamba-injury-mid-south (last visited Aug. 23, 2017).

239.     The damage caused by Defendants' dicamba products was expected. According to Dr. Jason Norsworthy, an Extension weed scientist at the University of Arkansas, to the *Delta Farm Press* in August 19, 2016 article titled "Dicamba Drift Was Expected, No Blindsiding" – "There was no blindsiding. We knew this was likely to be a major issue. We've been telling the [Arkansas State Plant Board] this for several years now. We've been saying it in all the winter meetings." *See* http://www.deltafarmpress.com/soybeans/dicamba-drift-expected-no-blind-siding (last visited Aug. 22, 2017).

240.     And as correctly stated by Dr. Ford Baldwin to *DTN/The Progressive Farmer* in July 2016 upon commenting on reports of off-target and off-label dicamba use, "It looks like a bomb went off in some parts of the South." *See* http://agfax.com/2016/12/29/dicamba-the-time-bomb-went-off-and-no-one-was-prepared-dtn/ (last visited Aug. 22, 2017).

241.     As for 2016, it has been estimated that approximately two hundred thousand acres of various crops, produce, and ornamentals in Arkansas, Tennessee, and Missouri were impacted by Defendants' wanton and reckless disregard of Plaintiffs and countless others like them.

### P.     Defendants' Licensing Agreements with Seed Growers

242.     At all times relevant to this Complaint, all purchasers and growers of Defendant

Monsanto's Xtend seeds are licensees of Xtend seeds. All purchasers and growers of such seeds must sign a Monsanto Technology/Stewardship Agreement (Limited Use License), available within Defendant Monsanto's Technology Use Agreements ("TUG") and TUG addendums.

243. These licenses and their requirements allow each licensed grower to use and plant Defendant Monsanto's Xtend seeds. Thus, Defendant Monsanto retains ownership of the Xtend seeds and the Xtend crop system and exercises extensive control and supervision over such licensees' use.

244. Defendant Monsanto's Technology/Stewardship Agreements give Defendant Monsanto the right to revoke the license/agreement with its licensees for any breach of the license/agreement.

245. Defendant Monsanto has stated that over-the-top spraying of older formulations of dicamba on Xtend crops is inconsistent with its instructions and labels, and thus, such a violation is a breach of the license/agreement, providing Defendant Monsanto with a basis for revoking the license/agreement.

246. However, in 2015 and 2016 (and allegedly, 2017), with full knowledge that some of its licensees were spraying older formulations of dicamba over-the-top on Xtend crops, Defendant Monsanto took no actions to indicate it was remotely interested in revoking any of its licensee's licenses/agreements. *See* Ex. 1B – Donald Masters Deposition Testimony at Tr. 152:1 – 8.

247. As long as Defendant Monsanto's licensees continue to purchase and use Defendants' dicamba products, Defendant Monsanto will do nothing to protect innocent third-parties, such as Plaintiffs, despite possessing the most power to do so. Defendant Monsanto has shown this time and again.

248.    For instance, on July 6, 2015, when Defendant Monsanto was asked at public hearings before the Arkansas State Plant Board whether the company intended to revoke any licenses/agreements with its licensees who violated their contracts by illegally spraying dicamba herbicides, Duane Simpson of Defendant Monsanto stated that its use agreements with licensees would only be pulled in a worst-case scenario.

249.    Also, in a separate meeting before the Arkansas State Plant Board on July 25, 2016, a spokesman for Defendant Monsanto, Dr. Boyd Carey, specifically rejected the idea of revoking any agreements with its licensees who used older, illegal formulations of dicamba on Xtend crops and indicated that these licenses/agreements would probably not be pulled.

250.    Defendant Monsanto has not cancelled a single license/agreement with its licensees for their use of any dicamba herbicide.  *See* https://www.agweb.com/article/dicamba-questions-cloud-2017-horizon-naa-chris-bennett/ (last visited Aug. 17, 2017).

251.    In public statements, as shown below, Defendant Monsanto denies having any control over licensees of its Xtend seeds and claims the spraying of older formulations of dicamba on its Xtend crops is from "third-parties."

252.    For instance, in a statement issued by Defendant Monsanto's Charla Lord on February 16, 2017, in response to the dicamba damage that occurred in Missouri in 2015 and 2016, Ms. Lord stated that the use of dicamba herbicides on Xtend seeds, "was illegal and performed by third-parties over whom Monsanto has no control."  This statement is absolutely false.  *See* http://molawyersmedia.com/2017/02/16/monsanto-facing-class-action-suit-over-dicamba-spraying/ (last visited Aug. 23, 2017).

253.    Defendant Monsanto remains in a contractual, licensing agreement with its licensees who purchase Xtend seeds, who illegally sprayed older formulations of dicamba on

Xtend crops, and faced no repercussions from Defendant Monsanto. *See* http://www.missourinet.com/2017/02/16/missouri-farmers-join-class-action-lawsuit-against-monsanto-in-herbicide-controversy/ (last visited Aug. 18, 2017).

254.    Defendant Monsanto did not pull these license/agreements with its licensees because to do so would have undermined its scheme with Defendant BASF to corner the market for GM seed and herbicide sales no matter the cost or damage suffered by innocent third-parties, like Plaintiffs.

255.    At all times relevant to this Complaint, Defendants hid the level of control that Defendants had over farmers who sprayed dicamba-based herbicides on Xtend crops in Southeast Missouri and injured Plaintiffs' crops.

256.    At all times relevant to this Complaint, Defendants also failed to provide proper training to their purchasers, licensees, and applicators of their dicamba products.  Such absence, coupled with Defendant Monsanto giving its licensees the green light to spray illegally, ensured that a dicamba crisis would occur and Defendants would reap the harvest of profits when it did.

**Q.    Defendants' Marketing and Advertising**

257.    Defendant Monsanto's marketing and advertising materials for Xtend soybeans influenced and induced farmers in Southeast Missouri to purchase Xtend seeds.

258.    Throughout 2016 and beyond, Defendant Monsanto marketed and sold its dicamba products to consumers and those searching for the right seeds and herbicides to purchase in 2017 to institutionalize a false message – that farmers need Defendants' system and the Xtend system provides greater yields than other seeds on the market.

259.    For example, Defendant Monsanto's website claims "the Roundup Ready Xtend Crop System is an advanced weed management system that helps control more resistant and tough-

to-control broadleaf weeds in soybeans and cotton than any other crop system." The website boasts that Xtend soybeans are "[b]uilt on the proven yield performance of Genuity Roundup Ready 2 Yield technology" and allegedly have a "5.4 Bu/A [bushel per acre] average advantage vs. LibertyLink® in herbicide system trials." The website also claims Xtend cotton has, allegedly, "60 lbs. lint/A [lint per acre] average advantage vs. top yielding competitors." *See* https://www.roundupreadyplus.com/resourcecenter/advanced-weed-control-technology (last visited June 25, 2017); *see also* https://www.roundupreadyxtend.com/Pages/default.aspx (last visited June 25, 2017).

260. Further, in a press release dated November 9, 2016, titled "Farmers to Realize The Benefits Of The Roundup Ready Xtend Crop System in 2017," Defendant Monsanto stated the Xtend crop system was intended to maximize crop yield potential and allow farmers to control tough, glyphosate resistant weeds." *See* http://news.monsanto.com/press-release/products/monsantos-xtendimaxtm-herbicide-vaporgriptm-technology-approved-epa-crop-use (last visited Aug. 18, 2017).

261. The overall, alleged advantage of Defendant Monsanto's Xtend soybeans, however, has been disproved by the agricultural scientific community. The 2016 test trials by weed extension programs at the University of Minnesota and the University of Wisconsin found just the opposite – lower yields.

262. In these field trials, Xtend soybeans tended to yield a bushel or two lower on average. *See* http://blog-crop-news.extension.umn.edu/2016/10/u-of-m-se-minnesota-dicamba-tolerant.html (last visited Jan. 18, 2017); http://ipcm.wisc.edu/blog/2016/11/new-traits-dont-automatically-translate-to-highest-yield/ (last visited Jan. 18, 2017).

263. These scientific results stand in stark contrast to assertions made by Miriam Paris,

Defendant Monsanto's U.S. Soybean Marketing Manager. In July 2016, Ms. Paris claimed the potential for greater yields, a two and a half to seven bushel-per-acre yield advantage above Roundup Ready 2 Yield varieties, factored into the company's decision to commercialize Xtend soybeans in 2016, despite the absence of a safe, approved dicamba herbicide for use with the seeds and crops at that time.

264. Throughout 2016 and beyond, as consumers were making decisions about what seeds and herbicides to purchase and plant in the future, Defendant Monsanto ran false, misleading, and confusing advertisements for its Xtend crop system.

265. One of these advertisements for Defendant Monsanto's Xtend soybeans ran in a September 2016 issue of *Delta Farm Press* and is particularly misleading. This advertisement claims, "The Field Was Spotless," and provides a quote from Steve Minner, a corn and soybean farmer in Morley, Missouri, who states in the advertisement: "I was able to spray dicamba on my Asgrow Roundup Ready 2 Xtend production acres this season and the field was spotless. I can't wait for dicamba to receive regulatory approvals to help control tough pigweed."

266. Defendant Monsanto's "The Field Was Spotless" advertisement is misleading, deceptive, and false for several reasons:

(a) First, the title is misleading. No dicamba-based herbicides were approved by the EPA for use with Xtend soybeans at the time this advertisement ran in September 2016;

(b) The advertisement does not identify what type of dicamba Mr. Minner used on his Xtend soybeans – Banvel, Clarity, a test trial of XtendiMax, etc. – and suggests any dicamba product could be used;

(c) The advertisement also fails to discuss the use of any dicamba formulation, whichever one was used, and how was used, at what spray rate or tank mix, and the number and timing of applications;

(d)     The body of the advertisement does not state whether the application of dicamba was legal or illegal;

(e)     If this was an illegal application of dicamba, then the advertisement gives an impression that Mr. Minner is boasting about an off-label application of dicamba;

(f)     The only mention of the illegality of spraying dicamba and use instructions appears in very fine print at the bottom of the advertisement; and

(g)     When Mr. Minner is quoted as saying "the field was spotless," the advertisement assumes the farmer acquired 100% weed control with dicamba – information that has been flatly rejected by scientific data (*see* http://agfaxweedsolutions.com/2017/05/05/herbicide-resistance-dicamba-not-effective-pigweed-populations-says-study/ (last visited Aug. 17, 2017).

267.    Weed scientists have been critical of this advertisement because Defendant Monsanto touts the advantages of its dicamba technology during a time when dicamba damage complaints were surging in Missouri and other states due to the release of its dicamba products. *See* https://crops.extension.iastate.edu/blog/bob-hartzler/ad-hall-shame-worthy (last visited Aug. 17, 2017).

268.    Defendant Monsanto ran other misleading and false advertisements for its Xtend soybeans in September 2016 issues of *Delta Farm Press*, such as "The Answer to Resistant Weeds Is Here." This advertisement is misleading, false, and deceptive in the following ways:

(a)     The title is misleading. No dicamba-based herbicides were approved by the EPA for use with Xtend soybeans at the time this advertisement ran in September 2016;

(b)     The advertisement states "the answer" to resistant weeds is available, but "the answer" refers to the ability to control pigweeds in DT crops when no safe herbicide was approved;

(c)     The "strong defense" stated in the advertisement refers to Defendant Monsanto's unapproved and unregistered herbicide. In 2016, there was no strong defense, and to state or imply otherwise is false and misleading;

(d)    The "raise your yield potential with elite genetics" statement in the advertisement is inaccurate and counter to available, unbiased research; and

(e)    The advertisement suggests farmers can use dicamba on Xtend crops, which, at the time, was illegal.  Because Defendant Monsanto is advertising its seed system as "the answer" and the herbicide for that system is unavailable, the advertisement is misleading.

269.    Additionally, Defendant Monsanto's "Xtend Your Yield" advertisements for Xtend seeds, in tandem with web and social media contests and marketing campaigns under the same name on Facebook, Twitter, Instagram, YouTube, Snapchat, Pinterest, LinkedIn, @MONSANTOCO, @RRPLUS, #xtend, #XtendYourYield, and #MyFarmMyYield, are also false, misleading, and confusing because the advertisements and marketing campaigns focus on the yield potential of Xtend seeds, which have not proved to outperform other GM seed technologies.  *See id.*; *see* http://www.roundupreadyxtend.com/xtendyouryield/Pages/default.aspx (last visited Aug. 17, 2017).

### R.    Reaction to Dicamba Drift

270.    There is a growing fear of what will happen to farmers across the country, including Plaintiffs, when Monsanto's XtendiMax is unleashed full-scale on the market because farmers and applicators spraying dicamba will increase exponentially.

271.    Because of the widespread damage to crops, and because of Monsanto's inaction and near indifference to the damage it caused by putting its Xtend products on the market, a media firestorm began, causing negative publicity for Monsanto.  National media outlets across the nation, including the Wall Street Journal, National Public Radio, Mother Jones, ecowatch.com, Bloomberg, and DTN/The Progressive Farmer, picked up the story, as did numerous local media in areas where dicamba drift was damaging neighboring farms.

272.    In light of the widespread damage and complaints by farmers, on July 29, 2016, the

University of Missouri Extension held a Dicamba Crop Injury Forum to share and gather information on the dicamba damage.

273.	The forum, held at the Fisher Delta Research Center in Portageville, Missouri, was organized in response to the devastation, the mass outrage, and the growing concerns of farmers and citizens, including Plaintiffs.  More than one hundred thirty people attended.

274.	Throughout the summer of 2016, as evidence of crop damage caused by dicamba continued to escalate, concerns in and among the agricultural community increased.  The evidence of dicamba damage was real and widespread, so much that federal and state governments got involved.

275.	The EPA is continuing investigations throughout the country on the misuse and misapplication of dicamba on Xtend crops.

### (1)	Missouri Special Hearing on Dicamba

276.	On August 31, 2016, the Missouri House Select Committee on Agriculture ("Committee on Agriculture") held a special hearing at the Fisher Delta Research Center in Portageville, Missouri in an effort to gather information and assess the problem and ramifications of dicamba and its impact on sensitive crops.

277.	Members of the Committee on Agriculture in attendance at the special hearing were: Chairman Representative ("Rep.") Bill Reibolt, Rep. Tracy McCreery, Rep. Sonya Anderson, Rep. Mike Bernskoetter, Rep. J. Eggleston, Rep. Jay Houghton, Rep. Sue Meredith, Rep. Tommie Pierson, Rep. Craig Redmon, and Rep. Don Rone.  Also in attendance at the special hearing was Missouri Speaker of the House, Rep. Todd Richardson.

### (a)	Testimony of Monsanto

278.	Testimony at the special hearing began with Duane Simpson speaking on behalf of

Monsanto.  Mr. Simpson leads Monsanto's state and local government affairs team.

279.   Mr. Simpson outlined the history of dicamba and Monsanto's efforts to gain EPA approval for its allegedly "cost-effective" VaporGrip.

280.   Further, Mr. Simpson discussed the causes of off-target dicamba movement, including spray drift, volatilization, and chemical contamination.  He admitted that Monsanto identified spray drift as the number one, overwhelming cause of dicamba's off-target movement.

281.   Mr. Simpson admitted Monsanto has undertaken several large-scale drift trials across the country to conduct research on dicamba drift.

282.   Mr. Simpson stated VaporGrip has a low volatility and numerous application restrictions.

283.   Mr. Simpson alleged Monsanto's testing shows that VaporGrip will have two percent of the relative volatility of older dicamba formulations.

284.   Mr. Simpson admitted Monsanto plans to offer VaporGrip to farmers and applicators, but had not yet done so.

285.   Mr. Simpson stated that Monsanto would not host its first academic symposium on its new dicamba products until the end of 2016.

286.   Mr. Simpson also admitted:

   a) General training with dealers, applicators, and numerous farmers on Monsanto's VaporGrip and Xtend products cannot begin until the EPA releases a final label for VaporGrip;

   b) The critical time for herbicide training is in the fall – the same period of time when Monsanto hoped to have final label approval to begin their dicamba product training program;

   c) With the Xtend soybean and cotton on the market for the last two years, Monsanto did not want to train specifically on how to use dicamba in-crop because it was illegal at the time;

d) Monsanto has been waiting six and a half years for label approval, which is five years beyond what Monsanto anticipated;

e) The first and most important next step for Monsanto is to receive a label from the EPA; and

f) Monsanto is concerned about the damage they have seen from "the alleged illegal misuse of pesticides."

287.    According to Mr. Simpson, it was Monsanto's expectation that they "would have [VaporGrip] available" by Spring 2017.

288.    "We can't sell the chemistry to retailers until the label is done," Mr. Simpson stated. "There is an urgency for training on the final label."

**(b)    Testimony of the Missouri Department of Agriculture**

289.    Up next to testify at the special hearing was Judy Grundler, Director of the Plant Division with the MDA.  Ms. Grundler stated her department began receiving complaints on June 22, 2016 in a four county area in Southeast Missouri.  Within this area, the MDA received over one hundred forty pesticide/dicamba complaints, including a few dicamba complaints from Butler and Carroll Counties.

290.    Ms. Grundler discussed the time and financial investments required to fully investigate a pesticide complaint, which can take months and requires certified laboratory testing. Ms. Grundler also commented on the low civil penalty in Missouri for violations of the Missouri Pesticide Use Act.

291.    Ms. Grundler stated that a different seed and herbicide company chose not to release its GM seeds in Missouri.

292.    Further, Ms. Grundler stated that Monsanto released its Xtend seeds because Monsanto had received import approval from China for the seeds in January 2016.

**(c)    Testimony of Dr. Kevin Bradley**

293.    Dr. Kevin Bradley also testified at the special hearing.  In addition to his position at the University of Missouri, Dr. Bradley has been a state Extension Weed Scientist for the past thirteen years.

294.    During his testimony, Dr. Bradley recalled the steady stream of pesticide complaints that came into the MDA in June 2016 – up to eight to ten calls per day.

295.    Dr. Bradley noted Monsanto has done research on Xtend soybeans since 2006 and there is a lot of data on the seed regarding its weed control capability.

296.    However, Dr. Bradley testified there has been concern from "day one" about bringing a product to market that will be sprayed with dicamba.  Tomatoes, tobacco, peach trees, and soybeans that are not dicamba resistant will be negatively impacted.

297.    And despite the application protections suggested by VaporGrip's then-pending label, Dr. Bradley testified he is not confident those protections will work because not enough research has been done.  "This new formulation is not going to solve everything," he said.

298.    Dr. Bradley stated, "We just experienced an experiment in Missouri, Arkansas, and Tennessee as to what could occur with dicamba once it gets out there on a larger basis."

299.    According to Dr. Bradley's testimony, by 2017, soybean farmers will have no choice but to plant Xtend soybeans simply to protect themselves.  "Soybeans are incredibly sensitive to dicamba," he said.  Farmers will effectively be left with only one soybean seed they can plant if they want to continue in the farming industry.

300.    Dr. Bradley testified that research on VaporGrip has been done only from a weed control standpoint.  No university researcher has been allowed to evaluate its volatility.

301.    Dr. Bradley further expressed his frustration with the limitations placed on university researchers by companies like Monsanto that want to protect their patents and

technology.  Because of this, Dr. Bradley and other independent researchers are never able to test dicamba-based herbicides, such as VaporGrip, or study their impact.

302.    Dr. Bradley also explained how temperature inversions factor into the dicamba damage.  Between the months of June and July in Southeast Missouri, there are temperature inversions that last between eight to ten hours, mostly in the evenings and overnight.  The more humidity there is, the hotter the temperatures rise, and more volatility occurs in these herbicides.

303.    Dr. Bradley stated he has also spoken to a farmer who sprays pesticides at ten o'clock at night, directly into a temperature inversion where the pesticide can literally move miles away.

304.    Further, despite herbicide labels warning against spraying in a temperature inversion, whether or not farmers know what a temperature inversion is or means or looks like is an additional concern.

305.    Finally, Dr. Bradley answered the ultimate question posed by the dicamba problem: Is it normal practice for a GM seed to hit the market without an approved, corresponding herbicide? "No," Dr. Bradley testified.  "Many have said and I would agree that is part of the problem.  We have a trait without [a] corresponding herbicide to go with it.  Allegedly, a certain number of farmers have said, 'I'm gonna spray the old herbicide because I have this trait out here [in the fields] and you won't give me the new stuff.' "

306.    As accurately stated by Dr. Bradley to DTN/The Progressive Farmer, because some farmers do not like to turn in other farmers, approximately one hundred thousand acres of soybeans were damaged in Missouri alone in 2016, to say nothing of the acreage damaged in other states.

(d)    **More Testimony from Southeast Missouri Farmers**

307.    A number of other local farmers in Southeast Missouri also testified before the

committee regarding their experiences and difficulties with dicamba.

308.    Ellis Sapp, a soybean farmer from Mississippi County, Missouri testified he and his father farm over 3,200 acres of soybeans.  Every acre of their soybeans had been hit with drift, damaging about 1,700 acres of soybeans.

309.    Most of the Sapp's soybeans were hit early in the growing season with pesticide and dicamba drift, Mr. Sapp said.  The Sapp's crops are planted near or around Xtend cotton fields.

310.    Mr. Sapp testified that one of the reasons Monsanto put its Xtend seeds on the market was because farmers wanted the technology to increase their crop yields by six to ten more bushels per acre.

311.    Mr. Sapp testified that his 2016 crop yield for his non-Xtend soybeans should have been seventy to eighty bushels per acre, but he estimated he would only get between twenty-five and forty bushels per acre due to damage from dicamba.  "It's not good.  I mean it's pretty bad for some of us," he said.

312.    Eddie Bowman from Stoddard County, Missouri also testified.  Mr. Bowman grows forty acres of cotton.  In 2016, he grew Xtend cotton.  Mr. Bowman, who did not state whether or not he used dicamba on his crop, testified he has chopped his cotton (removed weeds) three times in 2016.  Mr. Bowman's neighbor behind him, however, who plants six hundred forty acres of Xtend cotton has not chopped once.  "So it's pretty clear what he's using," Mr. Bowman said.  He also testified he suffered dicamba damage to two hundred fifty acres of soybeans, and that his soybean yield would drop to twenty bushels per acre.

313.    The final farmer to testify at the special meeting was Joe Woolverton from New Madrid County, Missouri.  Mr. Woolverton grows two thousand acres of soybeans.  Every field that he grows was damaged by pesticide drift.

(2)     **Meetings Beyond Missouri**

314.    The meetings at the Fisher Delta Research Center in Missouri are not unique.  These sorts of meetings and hearings are happening throughout the country.

315.    On July 25, 2016, the Arkansas Plant Board met in Little Rock, Arkansas, to review policies on dicamba and 2,4-D.  The Plant Board accurately anticipated a large turnout, so it made room for overflow.

316.    Sworn testimony has established that Monsanto's representatives made a practice of directing farmers who purchased its Xtend seeds to illegally spray dicamba to protect their crops.

317.    At the July 25 meeting, the Arkansas Plant Board also discussed banning Monsanto's XtendiMax herbicide altogether, in addition to other restrictions such as requiring proper testing by university researchers for Monsanto's VaporGrip, a ban on all applications of DMA salt or acid formulations of dicamba, buffer zones between dicamba-treated fields and non-dicamba fields, and cut off dates for pesticides that contain dicamba.  The committee also considered ways to regulate seed systems by making sure the proper pesticide is purchased with the seed.

318.    On November 21, 2016, the Arkansas Plant Board held a three-hour public hearing on the proposed XtendiMax ban.  One hundred and sixty people attended this meeting and twenty people testified.  Several farmers testified about the damage they suffered from dicamba:

   a)  Reed Storey, a Marvell, Arkansas, farmer, testified that he and his father had approximately six hundred acres of soybeans that they could visually identify as damaged by dicamba gone astray, estimating a $70,000 loss of income; and

   b)  Tim Roberts, Ozark Mountain Poultry, based in Rogers, Arkansas, said his company is already receiving significant pushback from growers who have traditionally supplied them non-GMO soybeans for a premium.  "Producers fear

56

neighbors will use off-label products and they need to plant Xtend soybeans as a defensive move."

319. Also at the November 21 hearing, the Arkansas Plant Board unanimously passed a rule to ban the use of XtendiMax in the state. In advance of the hearing the Plant Board received 245 comments that overwhelmingly favored harsh restrictions on dicamba products with 192 comments in support, thirty-three requests for a ban of all dicamba products, and only five comments opposing the restrictions.

320. On January 4, 2017, Arkansas Governor, Asa Hutchinson, sent a letter to the chairman of the Arkansas State Plant Board approving the board's proposed amended regulation to ban Monsanto's XtendiMax, pursuant to Executive Order.

321. On January 17, 2017, an Arkansas legislative panel signed off on the Plant Board's XtendiMax ban and its other restrictions for dicamba-based herbicides.

322. In support of this new "Dicamba rule," Terry Walker, Director of the Arkansas Plant Board, noted that Monsanto did not make XtendiMax available for third-party study. Mr. Walker said Plant Board members would be happy to make it their policy that Monsanto make its herbicide available for study. "The Plant Board, in essence, was working blind with a limited amount of data," he said.

323. In September, 2017, after receiving nearly 1,000 complaints, the Arkansas Plant Board unanimously voted to ban the use of all dicamba products from April 15, 2018 through October, 31, 2018. This effectively bans Defendants' dicamba-based herbicides from being sprayed over-the-top of Monsanto's Xtend seeds.

324. Mississippi has also proposed rules to reduce the aerial spraying and wind speed allowance for XtendiMax and other dicamba herbicide applications.

**S. Industry Denies Responsibility in 2015-2016**

325.    During and after the deluge of dicamba damage complaints to the MDA in 2015 and 2016 and the ravaging of Plaintiffs' crops caused by dicamba volatilization and off-target movement, Defendant Monsanto has consistently denied any wrongdoing for the negligent release of its Xtend crop system.

326.    On August 1, 2016, for example, Dan Urnikis, Industry Affairs Lead, and Kyel Richard, Product Communications Lead for Defendant Monsanto, were asked by a reporter from the *Delta Farm Press* about the premature sale and distribution of Xtend cotton and soybeans without a corresponding dicamba formulation.  Mr. Urnikis evaded the question as follows:

> [A]t this time, there is no approved chemistry over-the-top for the Xtend crop system . . . We've been developing soybean varieties for several years in anticipation of a full regulatory approval.  That process takes several years and we've had continued delays.  Our best products continue to sit on the shelf . . . So, farmers tell us they'd prefer to try new varieties on their farm for small quantities in initial years to see which work on their farms the best.  We chose to launch this year to allow growers to experience the industry-leading varieties of [Xtend] soybeans.  They can plant with confidence this year in anticipation of the chemical approval for the 2017 growing season . . . We thought it important for growers to get the opportunity to experience the new technology while really understanding the requirements and expectations for farmers to follow the label when applying herbicides on their farms . . . Pending regulatory approval, next year we'll be out with a Roundup Ready cropping system that features the VaporGrip . . .

327.    When asked by the *Delta Free Press* if Defendant Monsanto had a position on the growers who illegally sprayed dicamba off-label on their Xtend products, Mr. Urnikis stated, "We understand the EPA is investigating and Monsanto is supporting that work."

328.    To the same question, Kyel Richard replied, "The thing I want to underline is we, as a company, aren't an enforcement agency . . . As a company, we can't speculate on what action government officials will take – especially those who are investigating complaints . . . It's very important to note that [Defendant Monsanto] doesn't manufacture any dicamba products . . . it isn't our [dicamba] products being used."

329.    On or about August 2, 2016, Philip Miller, Vice President of Global Regulatory Affairs for Defendant Monsanto, stated to *The Wall Street Journal* that Defendant Monsanto does not manufacture older versions of dicamba.  Mr. Miller failed to state that its Xtend partner, Defendant BASF, does.

330.    On or about August 3, 2016, Miriam Paris stated to *DTN Progressive Farmer*, "We've been developing Xtend soybeans for over a decade . . . At what point do we not bring forward these really strong genetics."

331.    On August 4, 2016, Defendant Monsanto released a statement by Miriam Paris titled, "Monsanto Statement on Reports Alleging Illegal Dicamba Use."

332.    In the August 4 statement, Defendant Monsanto described the release of Xtend soybeans as a test and hoped to offer for the 2017 growing season a "complementary weed killer called dicamba" to pair with Xtend seeds that will "significantly reduce off-target movement."

333.    Ms. Paris returned to Defendant Monsanto's original justification for releasing the Xtend crop system early in the first place – higher yields.  "Therefore, we introduced the seed in order to give farmers a chance to test out our latest soybean varieties," Ms. Paris stated.  "Making the new soybeans available allows our customers to decide if they want to invest more acres in [Xtend soybeans] next year."  *See* https://monsanto.com/company/media/statements/illegal-dicamba-use-statement/ (last visited Aug. 21, 2017).

334.    Despite Defendant Monsanto's claims, Defendants knew that the releasing of the Xtend seeds prematurely removed farmers' choice.  Defendants' actions amounted to fear-based marketing.  With 25 million acres of Xtend crops planted in 2017, it clear that Defendants' plan worked.

335.    Despite Defendant Monsanto's insistence that it did not manufacture a dicamba product until it released XtendiMax for the 2017 growing season, co-conspirator and Defendant BASF sold and marketed numerous dicamba herbicides that were available for purchase by farmers and applicators to use on Xtend crops in 2015 and 2016.

336.    The coordinated efforts between Defendant Monsanto and Defendant BASF created mutual benefits, increased demand for their products, and a no-win situation for farmers – but a win-win for Defendants.   Defendant Monsanto benefited by releasing its Xtend seeds prior to EPA approval of XtendiMax and Engenia and profited off the sales of those seeds.  Defendant BASF reaped profits from the sales of its existing dicamba herbicides that farmers purchased and used illegally on Defendant Monsanto's Xtend crops.

337.    According to weed scientists, Defendant BASF's Banvel and Clarity formulations were used illegally in 2016 and caused dicamba damage to crops from volatility and drift.  *See* http://agfax.com/2016/12/29/dicamba-the-time-bomb-went-off-and-no-one-was-prepared-dtn/ (last visited Aug. 20, 2017).

338.    Defendants knew that the dicamba devastation in Missouri and other states in 2015 and 2016 would drive farmers to purchase their products and give rise to, as Dr. Kevin Bradley predicted, farming by self-defense.  *See* http://www.stltoday.com/business/local/suspected-illegal-herbicide-use-takes-toll-on-southeast-missouri-farmers/article_af161843-b6cf-5939-beba-fc23585e8478.html (last visited Aug. 20, 2017).

    **T.    The Sale and Distribution of XtendiMax and Engenia for Use with the Xtend Crop System in 2017**

339.    In 2017, Defendant Monsanto sold and distributed its Xtend seeds and Defendants sold and distributed their dicamba-based herbicides to farmers, growers, applicators, and licensees in Missouri and other states.

340.     Weed scientists and farmers correctly feared a wave of destruction to sensitive crops due to the volatility and drift-prone nature of Defendants' new dicamba formulations. *See* http://wreg.com/2017/06/16/arkansas-plant-board-motion-for-immediate-ban-of-dicamba-use-following-complaints/ (last visited Aug. 20, 2017); *see* http://agfax.com/2016/12/29/dicamba-the-time-bomb-went-off-and-no-one-was-prepared-dtn/ last visited Aug. 20, 2017).

341.     Dr. Jason Norsworthy stated to *Farm Journal* in late January 2017, "The dicamba situation was bad in 2015 and worse in 2016. Lots of people are worried about a big dicamba collision in 2017." *See* https://www.agweb.com/article/dicamba-questions-cloud-2017-horizon-naa-chris-bennett/ (last visited Aug. 22, 2017).

342.     As a result of Defendants' fear-based marketing, greed, and quest for profits, Defendant Monsanto sold 25 million acres of Xtend seeds in 2017.

343.     Defendant Monsanto stated the launch was one of their largest ever. *See* http://www.indianaprairiefarmer.com/crop-protection/monsanto-officials-add-their-perspective-dicamba-issues-season (last visited Aug. 20, 2017).

344.     Also, according to Defendant Monsanto, XtendiMax is being used on many of those 25 million acres, resulting in the disaster of the 2017 growing season that has further damaged Plaintiffs. *See* https://monsanto.com/products/articles/dicamba-field-investigations-monsanto-learned-far/ (last visited Aug. 21, 2017).

345.     This spike from a mere one million acres of Xtend soybeans and 3 million acres of Xtend cotton sold in 2016 to 25 million acres of Xtend seeds in 2017 is a direct result of the dicamba disaster that Defendants conspired to set in motion at least by 2009, if not before. Their plans to partner in public and collude in private have reaped Defendants great profits at the expense of Plaintiffs and thousands like them.

346.    Defendants claim that their dicamba herbicides are the lowest volatility dicamba herbicides on the market.  Through their company executives and scientists, Defendants have gone to great lengths to promote this exaggerated and false message, giving the impression that their product won't move off-target.

347.    For example, Defendant Monsanto claims XtendiMax is designed to be the industry's lowest volatility dicamba herbicide with the addition of a VaporGrip additive, a mechanism that allegedly prevents the formation of dicamba acid and allows for an alleged 90% to 99% reduction in volatility compared to older dicamba herbicides currently on the market.  *See* https://www.roundupreadyplus.com/resourcecenter/advanced-weed-control-technology; https://www.roundupreadyxtend.com/About/vaporgriptechnology/Pages/default.aspx; https://monsanto.com/products/product-stewardship/articles/dicamba-xtendimax-vaporgrip-technology/;       https://monsanto.com/products/product-stewardship/articles/historic-testing-dicamba-formulation-xtendimax-vaporgrip-technology/ (last visited Aug. 24, 2016).

348.    According to Defendant Monsanto's Robb Fraley, XtendiMax and Engenia are 100 times less volatile than older dicamba herbicides.  *See* http://www.indianaprairiefarmer.com/crop-protection/monsanto-officials-add-their-perspective-dicamba-issues-season (last visited Aug. 21, 2017).

349.    Scott Partridge, Defendant Monsanto's Vice President of Global Strategy, has been even more definitive, stating XtendiMax "will not move far, including through volatilization."

*See*    http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html (last visited Aug. 22, 2017).

350.    Defendant BASF claims Engenia offers superior weed control and "a 70 percent reduction     in     volatility     when     compared     to     DGA     dicamba."          *See*

https://www.basf.com/us/en/company/news-and-media/news-releases/2016/12/P-US-16-251.html (last visited Aug. 19, 2017).

351. But despite their efforts to promote the safety of their products, Defendants knew their new dicamba herbicides are volatile, prone to drift, move off-target, cannot be sprayed during a temperature inversion, cannot be not be used safely with Xtend crops or any other crops, and cause massive harm to non-DT crops. Defendants foresaw the damage that would occur to Plaintiffs and others, yet Defendants suppressed these risks, lied to the public, legislatures and regulators, encouraged licensees to spray XtendiMax and Engenia, and lied to their consumers and licensees about the safety of their herbicides.

352. There is no non-volatile dicamba on the market. This sentiment is echoed by the scientific community time and time again.

353. As accurately stated by Dr. Tom Barber to *Farm Journal* in late January 2017, "Some people have an impression that the new formulations will be a silver bullet. If an applicator sprays too far above the canopy in a 15-mph wind, we're heading for serious physical drift regardless of volatility." *See* https://www.agweb.com/mobile/article/dicamba-questions-cloud-2017-horizon-naa-chris-bennett/ (last visited Aug. 24, 2017).

354. Similarly, weed scientists have also regarded with skepticism Defendants' statements that their dicamba herbicides will stop the dicamba problem. As accurately stated by Dr. Kevin Bradley to *DTN / The Progressive Farmer* in January 2017, "comments that the recently approved formulations are going to magically prevent drift and injury are misleading." *See* http://agfax.com/2017/01/17/dicamba-off-target-drift-10-lessons-learned-the-hard-way-dtn/ (last visited Aug. 24, 2017).

355.     Agreeing with these noted weed scientists is Dr. Mark Loux, a Professor of horticulture and crop science at the Ohio State University.  Dr. Loux states, "Yes, it is volatilizing for sure." *See* http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html (last visited Aug. 22, 2017).

356.     In unison with Dr. Bradley, Dr. Barber, and Dr. Loux are Dr. Jason Norsworthy, Dr. Aaron Hager, and Dr. Ford Baldwin, who all state there is no non-volatile formulation of dicamba, even now.   *See*  http://www.agupdate.com/crops/soybeans/dicamba-damage-is-back-and-possibly-worse-than-before/article_47cc776c-5aa6-11e7-9d43-e33904613167.html;

http://www.deltafarmpress.com/soybeans/baldwin-2-reasons-increase-target-dicamba-damage

http://www.croplife.com/crop-inputs/monsanto-illegal-improper-use-at-root-of-drift-problems/ (last visited Aug. 20, 2017).

357.     Further, the labels and instructions for Defendants' new dicamba-based herbicides provide insufficient information and do not warn about dicamba's volatility, its propensity to drift, and the severity of the damage and yield loss likely to occur to non-DT crops when farmers spray these herbicides and they move off-target.   *See* http://www.cdms.net/ldat/ldDF9000.pdf; http://www.cdms.net/ldat/ldDG8005.pdf;

http://agproducts.basf.us/campaigns/engenia/assets/pdf/Engenia-NVA-2016-04-385-0298-DT-soybeans-12-20-2016b-S.pdf (last visited Aug. 25, 2017).

358.      Due to their complexity, the over 4,500-word labels for Defendants' XtendiMax and Engenia, even if they were more restrictive, cannot prevent dicamba from moving off-target and causing damage, even when followed very carefully.

359.     Under optimal conditions, the XtendiMax and Engenia labels are extremely difficult for farmers to follow.  Dr. Larry Steckel referred to Defendants' labels as a "logistical

nightmare" and a near impossibility to attempt to follow. *See* http://news.utcrops.com/2017/07/cant-keep-dicamba-field/ (last visited Aug. 20, 2017); https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2017/07/12/states-contemplate-herbicide-2 (last visited Aug. 20, 2017).

360. Dr. Steckel also said, "Even following the label, some dicamba injury is likely to occur in neighboring fields." *See* http://www.deltafarmpress.com/soybeans/what-you-should-know-about-newly-approved-dicamba-formulations (last visited Aug. 21, 2017).

361. Dr. Steckel is not alone in his criticism of Defendants' herbicide labels. As accurately stated by Dr. Ford Baldwin in a *Delta Farm Press* article on June 15, 2017, "I said from the start the label couldn't be followed and allow all the acres to be sprayed in a timely manner." *See* http://www.deltafarmpress.com/soybeans/dicamba-drift-issues-move-back-spotlight (last visited Aug. 20, 2017).

362. Even when farmers follow Defendants' dicamba herbicide labels precisely, as many, including Dr. Jason Norsworthy, have, XtendiMax and Engenia move off-target. Therefore, they cannot be used safely.

**(1)      State Bans and Restrictions**

363. Such a recipe for disaster and a dramatic expansion of the use of dicamba on 25 million acres of Xtend crops in the U.S. in 2017 created a heightened sense of apprehension in many states, causing several states, including Missouri, to take action.

364. Arkansas was the first state to take preemptive action after XtendiMax and Engenia were approved by the EPA.

365. On January 17, 2017, Arkansas banned XtendiMax and older dicamba formulations for the 2017 growing season. Defendant Monsanto's failure to allow university weed scientists in Arkansas to perform volatility tests on XtendiMax was the stated reason for the ban.

366. The new rules in Arkansas also mandate buffer zones between dicamba-treated fields and non-dicamba fields, testing by university researchers on Defendant BASF's dicamba herbicide, and required an online training and certification course for all applicators. Defendant BASF's herbicide was begrudgingly not banned at that time because Defendant BASF had allowed the University of Arkansas and others to conduct some volatility testing.

367. Defendant Monsanto called the decision to ban XtendiMax "unfortunate," arguing that farmers need its technology to control weeds, despite the risks inherent to dicamba crop systems. *See* http://www.arkansasmatters.com/news/local-news/governor-approves-dicamba-rule/635811898 (last visited Aug. 20, 2017).

368. Also in early 2017, Missouri introduced tighter restrictions on the use of dicamba herbicides. On March 31, 2017, Missouri passed a bill to increase the penalty for off-label herbicide applications to $10,000 per violation. Repeat offenders will pay $25,000 per application.

369. Other states, such as Mississippi, North Carolina, and Tennessee also proposed harsher fines for illegal spraying and rules to restrict the use of XtendiMax, Engenia, and other dicamba applications.

370. Foreseeably, in 2017, despite the precautions taken by state legislatures, Missouri, neighboring Arkansas, and other states experienced a deluge of dicamba damage that far surpassed the damage that occurred in 2015 and 2016 combined. This sharp increase of damage was a direct result of the proliferation of Defendants' defective dicamba products on the market.

371.	Once XtendiMax and Engenia became available for use in 2017, Defendants' herbicides proved to be defective and inherently dangerous, as XtendiMax and Engenia both volatilize and drift, damaging non-DT crops, including Plaintiffs'.

372.	As early as May 2, 2017, Defendant Monsanto heard initial reports of dicamba damage occurring from the full-scale launch of its Xtend crop system.  In response, the company reissued its press release, dated August 4, 2016, regarding dicamba damage.  *See* https://monsanto.com/company/media/statements/illegal-dicamba-use-statement/ (last visited Aug. 24, 2017).

373.	In June 2017, the first dicamba damage complaints were reported in Missouri.  By the end of June 2017, the MDA had received 60 formal dicamba damage complaints.

374.	At the same time, the situation in Arkansas was grim with an explosion of 437 cases of dicamba damage.  Defendant BASF, the main target of these complaints, issued a statement on June 22, 2017 following a proposal by the Arkansas State Plant Board to place an emergency ban on Engenia:

> BASF is closely monitoring the recent actions taken by the Arkansas Plant Board and the official statements posted by the Plant Board on their website. From our field visits, Arkansas growers are successfully applying Engenia herbicide to dicamba-tolerant crops this season to combat resistant weeds. We are continuing to support their efforts.
>
> BASF is firmly committed to application stewardship and has worked diligently to equip and educate applicators of Engenia® herbicide with the knowledge to make good application decisions. Our goal is that our customers have the best experience possible when applying Engenia herbicide. We certainly want to hear from growers if they have questions regarding the use of Engenia® herbicide and we will continue to reinforce the need to read and follow label requirements.

*See* http://www.croplife.com/crop-inputs/basf-closely-monitoring-dicamba-situation-in-arkansas/ (last visited Aug. 21, 2017).

375. On June 23, 2017, the Arkansas State Plant Board approved an emergency rule by a vote of 9-5 to ban the use and sale of in-crop dicamba herbicides in Arkansas, including Engenia, calling Defendants' herbicides "unsafe" for their intended use.

376. In the wake of this decision by the Arkansas State Plant Board to ban the sale of dicamba for agricultural use, Defendants issued coordinated public statements that condemned Arkansas's attempt to protect farmers.

377. On June 24, 2017, Defendant Monsanto issued a statement that it was troubled by the Arkansas State Plant Board's recommendation. The statement consisted of remarks from Robb Fraley for Defendant Monsanto, as well as others from Defendant Monsanto. *See* https://monsanto.com/spotlight/articles/monsanto-statement-arkansas-plant-board-decision-dicamba/ (last visited Aug. 21, 2017).

378. Mr. Fraley stated the following:

I'm troubled by the Arkansas State Plant Board's recommendation to deprive Arkansas farmers of an important crop protection tool in the middle of a growing season, especially in light of not hearing directly from those farmers this recommendation impacts.

*See* https://monsanto.com/spotlight/articles/monsanto-statement-arkansas-plant-board-decision-dicamba/ (last visited Aug. 24, 2017).

379. In the same June 24, 2017 statement, Defendant Monsanto criticized the decision as abrupt and issued the following statement:

Today, the Arkansas State Plant Board recommended an action that will prevent farmers from having access to all of the available weed control options. The recommendation made by the Plant Board to ban the use in Arkansas of the only remaining dicamba product previously approved for in-crop use with dicamba-tolerant crops blatantly ignores the interests of Arkansas farmers. The Plant Board's decision was made without hearing directly from farmers about the impact of removing a valuable weed-management tool, without providing sufficient notice to the public and without allowing the opportunity for public input. The Plant Board did not allow farmers to describe how the Board's mid-season action to abruptly

remove a valuable weed management tool would affect their operations in connection with the approximately 1.5 million acres of dicamba-tolerant seed already planted throughout Arkansas. Instead the Board based its decision on off-target movement claims that are still being investigated and have not been substantiated.

Based on a prior decision by the Plant Board, Monsanto has not sold any dicamba products within Arkansas . . . Arkansas farmers should not be forced to continue to operate at a disadvantage to farmers in other states where bans like the Board's current proposed action do not exist.

*See id.*

380.    In a statement dated July 7, 2017, Defendant Monsanto weighed in once again on the Arkansas dicamba ban, characterizing it as premature:

[T]he decision to ban dicamba in Arkansas was premature since the causes of any crop injury have not been fully investigated. While we do not sell dicamba products in Arkansas, we are concerned this abrupt decision in the middle of a growing season will negatively impact many farmers in Arkansas.

*See* https://monsanto.com/spotlight/articles/monsantos-statement-arkansas-dicamba-ban/ (last visited Aug. 24, 2017).

381.    Defendant BASF, in a statement dated July 10, 2017, also addressed the Arkansas ban on its Engenia herbicide, along with a response to the actions being taken in Missouri, stating:

Recent actions taken in Arkansas and Missouri to ban or restrict the use of dicamba herbicides, including BASF's Engenia®, deprive farmers of the one option that has proven effective in controlling this worrisome, yield-robbing issue. These actions punish farmers who have successfully and lawfully used the product. It also fails to provide a reasonable deterrent to those who may be willing to ignore the ban or not strictly follow label instructions, which is a major culprit in a number of complaints. We feel a better approach would be developing a fact and science-based recommendation that focuses on a longer-term solution for farmers . . . It has been suggested it is time for a "pause" on dicamba. Unfortunately, farmers cannot hit "pause" on the growing season and their window of opportunity to protect their yields is closing.

*See* http://www.agproducts.basf.us/news-&-events/press-releases/current-press-releases/2017-our-view-on-dicamba-restrictions-in-arkansas-and-missouri.html (last visited Aug. 24, 2017).

382.     On July 11, 2017, the Arkansas State Plant Board's rule establishing a ban on the sale and use of dicamba for 120 days went into effect.  The sale, use, and application of all dicamba containing pesticides for agricultural use were prohibited.  The rule also raised the civil penalty for herbicide damage from $1,000 to a maximum of $25,000.  Sadly, by then, there were nearly 600 dicamba damage complaints and the agriculture community in Arkansas was left wondering how it could possibly recover.

383.     On July 19, 2017, Defendant BASF issued a second statement on the Arkansas ban of its dicamba herbicides, stating that its Engenia herbicide was brought to market after years of research, farm trials, and reviews by university and regulatory parties, that farmers told Defendant BASF that this new dicamba technology was needed, and that dicamba damage to non-DT crops is only due to "improper use" of dicamba and nothing else.  *See* http://www.agproducts.basf.us/news-&-events/press-releases/current-press-releases/2017-working-together.html (last visited Aug. 21, 2017).

384.     Missouri also instituted a dicamba ban, as dicamba damage complaints in the state, especially in Southeast Missouri, continued to snowball.

385.     On July 7, 2017, as a result of the ecological disaster occurring in Missouri, the MDA's Director of Agriculture issued a Stop Sale, Use or Removal Order on all products labeled for agricultural use that contain dicamba.  All on-farm applications of dicamba products in Missouri ceased immediately for in-crop, post-emergent use, including all sales and offers of sales for all dicamba products, including XtendiMax and Engenia.  *See* http://agriculture.mo.gov/news/newsitem/uuid/c1e77acb-f9af-47ac-9700-8a633f4cb74c (last visited Aug. 17, 2017).

386. In response to the order, Defendants again issued coordinated public statements. On July 8, 2017, Defendant Monsanto issued a statement that it would comply with the order and encouraged its growers and applicators to do the same. Defendant Monsanto's statement also said, "We spent years developing [XtendiMax] to minimize the potential for off-site movement. We want to stress how important it is that growers and applicators who use our product follow the label requirements." *See* https://monsanto.com/company/media/statements/monsantos-statement-missouris-dicamba-announcement/ (last visited Aug. 24, 2017).

387. The Missouri ban on dicamba only lasted six days. On July 13, 2017, the MDA issued a Notice of Release from the Stop Sale, Use or Removal Order for XtendiMax and Engenia. The sale, distribution, and use of XtendiMax and Engenia resumed in Missouri, subject to a Special Local Need label for the re-released dicamba-based herbicides, in effect until December 1, 2017.

408. These updated labels imposed new application requirements for applicators, including a 10-mph maximum wind speed restriction, a limited application timing window between 9:00 a.m. and 3:00 p.m., certification requirements for applicators, completion of an online notice of applicator prior to entering the field with a sprayer, recordkeeping requirements, and the applicator must measure and record wind speed and wind direction for each field prior to application. *See* http://agriculture.mo.gov/news/newsitem/uuid/864bbc1a-9871-48dc-8fe3-a3b518a9c15d (last visited Aug. 17, 2017).

388. Certified applicators are person who have undergone training and become certified in the safe use of restricted use products. To obtain a certified private application license in Missouri, the applicator must complete a training program through the University of Missouri Extension Office and complete a verification form.

389.	Several other states, including Arkansas, Alabama, Georgia, and North Carolina have also required Special Local Need labels.  These more restrictive labels for XtendiMax and Engenia have not stopped the damage.

390.	As accurately stated by Dr. Ford Baldwin in a *Delta Farm Press* article on August 17, 2017, "Additional application restrictions on the herbicides simply will not fix this problem." *See*  http://www.deltafarmpress.com/weeds/baldwin-latest-dicamba-research-and-new-task-force (last visited Aug. 19, 2017).

391.	Dr. Jason Norsworthy echoed Dr. Baldwin's concern, stating the biggest problem with Defendants' dicamba herbicides is their volatility, and the tighter restrictions on spraying XtendiMax or Engenia will not fix their tendency to move off target.  "I can fix physical drift," Dr. Norsworthy stated.  "I can't do anything about volatility." *See* http://www.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/#.WZtMIWp96TA.email (last visited Aug. 22, 2017).

392.	Missouri's brief ban and new restrictions on dicamba did not stop Defendants' dicamba herbicides from wreaking havoc to farmers' crops, including Plaintiffs', once farmers resumed spraying Defendants' dicamba herbicides on Xtend crops for the continuation of the 2017 growing season.

393.	More than half of the approximately 310 dicamba damage complaints that the MDA has received in 2017 have come since Missouri lifted its ban and put the new restrictions in place.

394.	The defect is with Defendants' products, not with the labels or the restrictions placed on them.  As accurately stated by Dr. Jason Norsworthy in the *Arkansas Democrat-Gazette* on August 18, 2017, speaking to an Arkansas task force appointed to address the future use dicamba, "This is a product that is broken.  This is a product we can't put on plants during the

summer months of 2017 and keep it there." *See* http://www.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/#.WZtMIWp96TA.email (last visited Aug. 22, 2017).

395. On July 11, 2017, the Tennessee Department of Agriculture took measures to mitigate the risk of dicamba damage by banning older formulations of dicamba for the remainder of the 2017 growing reasons, adding certification requirements for applicators, an application window between 9 a.m. and 4 p.m., and no dicamba applications on cotton after first bloom. *See* https://www.tn.gov/agriculture/article/ag-businesses-dicamba-resources (last visited Aug. 21, 2017).

396. In response to the dicamba restrictions in Tennessee, Defendant Monsanto released a statement on July 12, 2017. In this statement, Defendant Monsanto congratulated Tennessee's "good sense" decision to only ban older dicamba formulations for the 2017 growing season, not Defendants' newly-minted dicamba herbicides. *See* https://monsanto.com/company/media/statements/tennessee-dicamba-statement/ (last visited Aug. 17, 2017).

397. The actions by Arkansas, Missouri, Tennessee, and other states upon receiving over a thousand dicamba damage complaints and suffering millions of acres of damage in 2017 were again aimed to protect non-DT crops and specialty crop growers from the damage caused by the use of Defendants' defective dicamba products on Xtend crops.

398. In late July 2017, the EPA issued a second Compliance Advisory – Crop Damage Complaints Related to Dicamba Herbicides Raising Concerns – to replace its Advisory issued in August 2016.

399.    The 2017 Advisory addressed agricultural concerns with the conditional approval of the new dicamba-based herbicides and that some states are reporting high numbers of dicamba complaints.  "Both physical drift and volatilization of dicamba from the target application site have been reported," the EPA stated.

400.    Despite the EPA's comments and actions taken by Missouri and other states, Defendants have consistently pressed state agencies, weed scientists, and farmers not to rush to conclusions about the cause of the on-going damage in 2017.  Yet Defendants have publicly offered a plethora of conclusions about the cause of the damage.  Some of these are:

(a)    off-label use of older formulations of dicamba;

(b)    volatility of older and generic dicamba formulations;

(c)    volatility of older and generic dicamba formulations (exacerbated or confused by temperature inversions);

(d)    other herbicides, such as Liberty Link;

(e)    other crop protection products and additives;

(f)    contaminated equipment;

(g)    contaminated glufosinate products;

(h)    wind patterns;

(i)    wind speeds;

(j)    wind conditions;

(k)    other weather factors;

(l)    environmental factors;

(m)    disease;

(n)    calcium deficiency;

(o)     misdiagnosis;

(p)     "unsubstantiated" claims;

(q)     improper tank mixes;

(r)     improper sprayer clean outs;

(s)     aerial applications;

(t)     farmers using the wrong nozzles;

(u)     farmers using the wrong boom height;

(v)     farmers using the wrong spray pressure;

(w)     farmers' failure to follow guidelines and buffer restrictions; and

(x)     there is no real problem at all because the damage is cosmetic and will not cause yield loss.

*See*     http://www.indianaprairiefarmer.com/crop-protection/monsanto-officials-add-their-perspective-dicamba-issues-season; https://medium.com/@RobbFraley/talking-dicamba-with-farmers-what-i-learned-3830a07c6e75; http://www.croplife.com/crop-inputs/basf-in-arkansas-drift-cases-buffer-zones-mostly-not-followed/ (last visited Aug. 21, 2017).

401.     In other words, according to Defendants, everything but Defendants' defective product is to blame. Defendant Monsanto's Robb Fraley also said, without a shred of data in support, that the use of older dicamba herbicides in 2017 accounts for 25% of the applications, and thus the problems. *See id.* Even if this conjecture were true, Defendant Monsanto's refusal to cancel any use agreements with its licensees is exactly why licensees are emboldened to use any dicamba formulation they choose, knowing Defendant Monsanto will impose no consequences on them.

402.    According to Defendant Monsanto, the company is conducting its own investigations into reports of off-target damage from dicamba. "And we are visiting every single field," Scott Partridge stated. *See* http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html (last visited Aug. 22, 2017).

### (2)    Volatility Testing by Weed Scientists Proves Defendants' New Dicamba Herbicides Are Unsafe and Defective

403.    Unbiased weed scientists have been very clear through their analysis and data results that XtendiMax and Engenia are volatile herbicides, despite Defendants' claims to the contrary. Weed scientists have also identified the volatility of Defendants' XtendiMax and Engenia as the primary reason for the damage that is occurring to non-DT crops. *See* https://ipm.missouri.edu/IPCM/2017/7/Ag_Industry_Do_we_have_a_problem_yet/ (last visited Aug. 22, 2017).

404.    For example, on July 6, 2017, Dr. Kevin Bradley showcased his preliminary research and findings on XtendiMax and Engenia. In his presentation on the off-target movement of Defendants' dicamba herbicides, Dr. Bradley stated, "The majority of the fields I've been in are injured from one end to the other with no discernable difference in soybean symptomology. This suggests problems with off-site movement through volatility." *See* http://weedscience.missouri.edu/2017%20Dicamba%20Injury%20Forum.pdf (last visited Aug. 22, 2017).

405.    Dr. Bradley's research on the volatility of XtendiMax and Engenia, especially his preliminary results with air samples and indicator plants, suggest that both XtendiMax and Engenia can be detected in the air after application and that volatilization continues at least 24 hours after treatment. *See id.*

406. Further, Dr. Bradley's research shows that Defendant Monsanto's XtendiMax performs worse than older formulations of dicamba, like Banvel, and that over time, XtendiMax has the same, if not worse, volatility as Banvel. *See id.*

407. These findings rebut Defendant Monsanto's statements on the panoply of reasons for the dicamba damage occurring in Southeast Missouri and its claims that XtendiMax has reduced volatility compared to other dicamba herbicides. They also help explain why Defendant Monsanto refused to allow university scientists to test its XtendiMax herbicide for volatility and off-target movement. *See id.*; http://www.deltafarmpress.com/weeds/what-does-latest-research-dicamba-show; http://weedscience.missouri.edu/2017%20Dicamba%20Injury%20Forum.pdf

(last visited Aug. 22, 2017).

408. Dr. Thomas Mueller, a weed science professor at the University of Tennessee, also conducted independent research on Defendants' new dicamba-based herbicides. Dr. Mueller's data shows that Engenia volatilizes and can depart from a field at least 36 hours after application. Dr. Mueller stated:

> [Engenia] is moving from the site of application into the air immediately above the treated field. Subsequent later movement in air is to be expected. Given sensitivity of soybeans to POST dicamba, these data indicate that soybean injury in adjacent areas should be expected from vapor movement of dicamba after application. Yield effects from this injury, or multiple injuries (from multiple episodes of dicamba drift) are unknown, but yield reductions may be possible.

*See* https://aapco.files.wordpress.com/2017/08/dicamba-epa-call.pdf (last visited Aug. 23, 2017).

409. Dr. Meuller's research on Engenia refutes Defendant BASF's claims about the various reasons for the dicamba damage occurring in Southeast Missouri and its claims that Engenia's alleged reduced volatility compared to other dicamba herbicides renders it unsafe for its intended use. *See id.*

410. In response to Dr. Mueller's findings, Dr. Larry Steckel stated on the UT crops News Blog on July 18, 2017, "I have seen data as well that would suggest that XtendiMax shows [a] similar level of volatility over that same time frame." *See* http://news.utcrops.com/2017/07/cant-keep-dicamba-field/ (last visited Aug. 22, 2017).

411. Also, Dr. Jason Norsworthy's presentation "Primary and Secondary Large-plot Dicamba Movement," at Arkansas's August 8, 2017 Northeast Research and Extension Center Field Day in Keiser, Arkansas offers more scientific proof that Defendants' XtendiMax and Engenia herbicides are volatile and the volatility is long-lived. *See* https://www.youtube.com/watch?feature=youtu.be&v=DOTNglIORVU&app=desktop; http://www.deltafarmpress.com/weeds/what-does-latest-research-dicamba-show (last visited Aug. 22, 2017).

412. In his research and trials with XtendiMax and Engenia, Dr. Norsworthy discovered tremendous amounts of Defendants' dicamba herbicides moving off the research fields. After at least 12 days following applications of Defendants' dicamba herbicides, both XtendiMax and Engenia, volatilized and moved off-target, even when the herbicides were sprayed following the labels. *See id.*

413. Dr. Norsworthy's data revealed that when XtendiMax and Engenia were applied on the research field into a westward wind, damage occurred to non-DT crops on the east side of the field due to volatilization. When the wind shifted to blow out of the south six hours after application, damage occurred to the north side of the field due to volatilization. *See id.*

414. Further, Dr. Norsworthy introduced soybean plants originally grown in a greenhouse to the fields treated with Defendants' dicamba herbicides a half hour, 24 hours, and 36 hours after application. These plants were also severely damaged due to volatilization. *See id.*

415.     In addition, soybean plants that were sheltered under buckets near the treated fields when Dr. Norsworthy sprayed XtendiMax and Engenia and were uncovered 30 minutes and 36 hours after application also suffered damage due to volatilization.  "Is [XtendiMax and Engenia] volatizing and causing damage to plants under buckets?  Absolutely," Dr. Norsworthy stated.  *See id.*; http://www.nwaonline.com/news/2017/aug/12/tests-show-dicamba-s-volatility-2017081/ (last visited Aug. 22, 2017).

416.     Further, Dr. Norsworthy's data refutes the effectiveness of Defendants' buffer zone requirements for XtendiMax and Engenia, as off-target movement and damage to crops occurred well beyond the 110-foot buffer restrictions set by the labels, out to at least 220 feet, proving that Defendants' buffer zones are of little consequence in regard to volatility and drift.  *See id.*

417.     Despite Defendants' assertions that the cause of the dicamba damage is farmer and applicator error or an inability to follow the label requirements, Dr. Norsworthy's findings prove that a user can follow all of the regulations and still experience volatility and off-target movement for at least 36 hours after application Defendants' herbicides, if not more.  Dr. Norsworthy stopped his study at the 36-hour mark.  *See id.*

418.     Dr. Tom Barber, also a presenter August 8, 2017 Field Day in Keiser, Arkansas, echoed Dr. Norsworthy's findings on the volatility of XtendiMax and Engenia.  *See* http://www.nwaonline.com/news/2017/aug/12/tests-show-dicamba-s-volatility-2017081/?business (last visited Aug. 24, 2017).

419.     Additionally, Dr. Aaron Hager is among the many scientists who vehemently dispute Defendants' stated reasons for the dicamba-related damage.

420.     In his post on a pest management and crop development blog on the University of Illinois's website, Dr. Hager states, "Environmental conditions are frequently mentioned as

inducing leaf cupping, yet I cannot find any peer-reviewed literature that specify or describe these conditions." Dr. Hager also stated that there have been no reports of Xtend crops suffering from the effects of environmental conditions – a sign that many of Defendants' claims are blatantly false or invented. *See* http://bulletin.ipm.illinois.edu/?p=3942 (last visited Aug. 22, 2017).

421. Dr. Hager challenges Defendants' claims about the rampant use of the older formulations. He states, "If we should 'thoroughly investigate before drawing conclusions,' it seems premature to me to conclude the instances of volatility are wholly attributable to older dicamba formulations." *See id.*

422. Dr. Hager also disputes several other explanations Defendants have offered as the cause of the dicamba damage, including physical drift or contaminated equipment. Dr. Hager found that the symptoms in many affected fields "do NOT" follow patterns associated with drift or contaminated application equipment," and that exposure to volatility is the actual culprit. *See id.* (emphasis in original).

423. Additionally, according to Dr. Bob Hartzler, other herbicides rarely show uniform injury across entire fields. This is a specific injury pattern caused by dicamba volatilization. Dr. Hartzler emphasized that crop sensitivity to dicamba, the use of dicamba later in the growing season, higher temperatures, increased acreage, and the increased use of Defendants' dicamba products since 2015 only magnify the volatility of Defendants' already volatile products. *See* https://crops.extension.iastate.edu/blog/bob-hartzler/thoughts-dicamba-dilemma (last visited Aug. 22, 2017).

424. Dr. Aaron Hager agrees with Dr. Hartzler's position on the risk posed by dicamba in non-DT crops due to their sensitivity. As accurately stated by Dr. Hager to *Chemical & Engineering News* on August 21, 2017, "Soy is so sensitive to very small amounts of dicamba. It

is an amount like the spray when you open a can of Coke – but spread over an acre." *See* http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html (last visited Aug. 22, 2017).

425. In several statements, Defendant Monsanto's Robb Fraley has denied that Defendants' products will result in lost yields to non-DT crops. Dr. Fraley stated that leaf cupping, the foremost recognizable symptom of dicamba damage, is temporary, short-term injury in affected plants, and the injured plants will outgrow the damage and produce normal yields. *See* http://www.indianaprairiefarmer.com/crop-protection/monsanto-officials-add-their-perspective-dicamba-issues-season; https://medium.com/@RobbFraley/talking-dicamba-with-farmers-what-i-learned-3830a07c6e75 (last visited Aug. 22, 2017).

426. Defendants not only deny that injury caused by their dicamba products will cause yield loss in sensitive crops, but they state that in many cases the yields in injured crops will actually increase. *See* http://bulletin.ipm.illinois.edu/?p=3942 (last visited Aug. 22, 2017).

427. Weed scientists, however, contest Defendant Monsanto's absurd statement on the recovery and normal yield production of dicamba injured crops.

428. In an August 17, 2017 article in the *Delta Farm Press*, Dr. Ford Baldwin stated that in his many investigations of soybean fields damaged by Defendants' dicamba herbicides, he has observed that while some plants appear to recover from a vegetative standpoint after being injured by dicamba, a closer inspection of the injured plant shows that the pods and beans look and remain afflicted. "[W]hen you pull the plants back and look for blooms and pods it is a much different story," Dr. Baldwin stated. The result of dicamba injury to crops results in yield loss. *See* http://www.deltafarmpress.com/weeds/baldwin-latest-dicamba-research-and-new-task-force (last visited Aug. 22, 2017).

429.    Further, Dr. Aaron Hager rebukes Dr. Fraley's premature and unsubstantiated statement on the absence of yield loss in crops injured by Defendants' herbicides, calling it incredibly troubling, unprofessional, and unethical.  *See* http://bulletin.ipm.illinois.edu/?p=3942 (last visited Aug. 22, 2017).

430.    Such negligent and irresponsible behavior by Defendants is now the norm.  Despite overwhelming, unbiased scientific findings by the foregoing, respected members of the agricultural scientific communities, Defendants still deny that the cause of the harm to Plaintiff' and others in 2017 is the volatility of their herbicides.

431.    In a July 21, 2017 blog post on Defendant Monsanto's website, Brian Naber, Defendant Monsanto's U.S. commercial operations lead, stated:

> [V]olatility of the approved over the top products is ***not*** the major source of off-target movement.  Instead, the evidence we're seeing is pointing to: [i]llegal applications of non-approved products; [l]ack of compliance with the labeled spray requirements; and direct application of contaminated products that can result from either improper tank clean out or the use of contaminated products (emphasis in original).

*See*        https://monsanto.com/products/articles/dicamba-field-investigations-monsanto-learned-far/ (last visited Aug. 22, 2-17).

432.    Weed scientists have refused to back down from their positions about the ecological and agricultural crisis Defendants have created.

433.    For example, referring to Defendants' products as "broken," Dr. Jason Norsworthy recently told the members of a task force on dicamba that he does not recommend that dicamba herbicides     be     allowed     for     use     in     Arkansas.          *See* http://www.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/#.WZtMIWp96TA.email (last visited Aug. 22, 2017).

434. Additionally, David Hundley, a grain production manager for Ozark Mountain Poultry, a fast-growing poultry operation in Arkansas, told the Arkansas task force that the use of Defendants' dicamba herbicides is "not just bad; it's toxic." *See id.*

435. Thus, Defendants' coordinated statements and stated reasons for the damage serve Defendants' mutual purpose to act in concert to create a massive dicamba crisis from the sale and distribution of their dicamba products in order to ensure increased demand and profits.

436. By mid-August 2017, the total acreage of farmland, vegetation, and timber damaged by dicamba in the U.S. had reached approximately 3 million acres, with over 850,000 damaged acres in neighboring Arkansas and more than 300,000 acres of damage in Missouri, and these numbers increase with each passing day.

437. On August 24, 2017, the Arkansas task force on dicamba recommended severe restrictions for the in-crop use of dicamba herbicides, including Defendant's XtendiMax and Engenia herbicides. The task force recommended an April 15 cutoff for the spraying of dicamba in-crop. Defendants made presentations to the task force and admitted there is volatility and off-target movement of their new herbicides, but continued to place the blame for the nationwide dicamba damage on the applicators. *See* http://m.arkansasonline.com/news/2017/aug/25/task-force-recommends-april-15-dicamba--1/;
http://www.arkansasonline.com/news/2017/aug/24/panelists-meeting-again-on-dicamba-2017/?f=business (last visited Aug. 25, 2017).

438. In 2017, the rising numbers of dicamba damage complaints in Missouri and Arkansas are a tragic measure of the damage caused by Defendants' defective dicamba products.

439. As stated by Dr. Larry Steckel, commenting on the many dicamba damaged fields he has walked, "I knew we'd see drift and there'd be problems. But I had no idea it would be to

this scale. The scale caught us all off-guard, I think." *See* http://www.deltafarmpress.com/soybeans/new-dicamba-regulations-issued-tennessee (last visited Aug. 25, 2017).

440. As of the filing of this Complaint, the MDA has received over 310 dicamba damage complaints. The Arkansas State Plant Board has received approximately 1000 complaints. The number of complaints continues to rise.

441. In spite of farmers' losses due to the volatility of Defendants' herbicides and weed scientists' findings that Defendants' products are the cause of the problems of the dicamba damage, sales of Defendants' dicamba products will continue to soar as more and more soybean and cotton farmers in Missouri and elsewhere are forced to engage in self-defensive farming.

442. Through their concerted activities to suppress the risks of the volatility and damage caused by Defendants' dicamba products, and their fear-based marketing tactics, Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

443. Based on the volatility research conducted by university weed scientists and the heart-wrenching stories told by farmers whose crops have suffered damage at the hands of Defendants' products, it is evident there never was a safe, non-defective dicamba herbicide available for use with Defendant Monsanto's Xtend seeds. Defendants' new dicamba herbicides are dangerous and defective products that cannot be used safely for their intended use, thus making the entire crop system defective.

U.  **Representative Dicamba Damage**

444. In 2015, the number of farmers and commercial applicators who sprayed dicamba illegally were exponentially larger than the year before. For example, in 2014, of the ninety

pesticide drift complaints made to the Missouri Department of Agriculture ("MDA"), only three complaints were dicamba related. Then in 2015, there were twenty-seven dicamba-related pesticide complaints made to the MDA out of ninety-seven total pesticide drift complaints.

445. As accurately stated by Dr. Bill Robertson, an extension cotton agronomist for the Arkansas Division of Agriculture, two-thirds of Arkansas' cotton acres were planted with Xtend in 2016.

446. Monsanto's limited introduction of Xtend cotton in 2015 worked. Monsanto boasted in a February 2016 press release that demand for their Xtend soybeans (for sale in 2016) was strong, highly anticipated by farmers, and there were "significant pre-orders from farmers."

447. Damage to Plaintiffs in 2015 from Monsanto's irresponsible, negligent, and premature release of its Xtend crops continued and was compounded in 2016. These damages were facilitated by BASF's willing cooperation with Monsanto in the supply of dicamba to be applied over-the-top.

### (1) Dicamba Damage to Plaintiffs

448. In 2015, 2016, 2017, and 2018 Plaintiff Jerry Franks and others similarly situated grew crops from seeds that are not dicamba-tolerant.

449. Like others similarly situated, Plaintiffs Jerry Franks farms and crops are located near farms and fields that were planted with Xtend cotton and soybeans.

450. Near Plaintiff Jerry Franks' farm, farmers that planted Monsanto's Xtend soybeans and/or cotton seeds sprayed their crops with older dicamba over-the-top during the 2015 to 2018 growing season.

451.    In 2015, 2016, 2017, and 2018 Plaintiff Jerry Franks and others similarly situated saw dicamba damage to their crops, impacting soybean yields in 2015 – 2017; yield impact for 2018 is not yet known.

452.    Further, Plaintiff Jerry Franks has had to invade his retirement savings to keep his farming operation afloat and the pride and reputation for quality crops that he has built over the years has been decimated by Defendants' actions and the resulting dicamba use.

453.    Moreover, Plaintiff Jerry Franks and others similarly situated have suffered damage to their professional reputations, resulting in extreme disappointment, disrespect, and a diminution of trust in Plaintiffs and their crops.

454.    In each year 2015 through 2018, Plaintiff Jerry Franks planted approximately 230 acres of soybeans that were not dicamba tolerant.

455.    In each year, 2015 through 2018, the Jerry Franks' soybeans exhibited obvious signs of dicamba damage, caused by over-the-top spraying of dicamba on plants grown from DT seeds.

456.    The fact of damage to the Jerry Franks' crop yields is typical of the damages sustained by other class members.

457.    Moving forward, if Plaintiff Jerry Franks and others similarly situated continue to sustain dicamba damage to their crops, Plaintiff Jerry Franks and others similarly situated will be out of the agricultural business entirely and risk bankruptcy.

458.    As Dr. Kevin Bradley and many others in the agricultural community have observed, Plaintiffs and others similarly situated face the Hobson's choice of either planting Monsanto's Xtend soybeans, at an increased expense, to avoid damage going forward or risk having their non-dicamba tolerant crops damaged or destroyed.

459. Plaintiff Bumper Crops and other similarly situated farmers dedicated to growing non-GMO and/or organic crops, and those farming produce and other crops for which no dicamba tolerant variety exists, such as Plaintiff Wimberley Farms, are simply left to bear the burden of ongoing damages inflicted by Defendants' products.

460. It was inevitable that many farmers across the country would continue to spray dicamba on Xtend seeds, either by spraying XtendiMax or the older, less expensive, more volatile types of dicamba, extending the disastrous consequences of the dicamba tragedy to Plaintiff and others similarly situated on an epic scale.

461. This widespread dicamba problem stems from Monsanto's and BASF's organized scheme to establish an unfair market advantage for Monsanto's Xtend crops and BASF's dicamba-containing herbicides by using Plaintiffs and others similarly situated as the unwilling test subjects of an incomplete Xtend crop system that will fill Defendants' pockets at the expense of all Plaintiffs' livelihoods, heritage, health, and well-being.

462. The experiences of Plaintiff is typical of class Plaintiffs across Missouri. As evidenced by the numerous complaints to departments of agriculture nationwide, the repeated stories of the same types of damage, the hearings, the news articles, near unanimous findings by top university researchers, and investigations by state and federal agencies, including the Federal Bureau of Investigation and the EPA, Defendant Monsanto's defective "crop system" and Defendant BASF's defective dicamba herbicides created a pervasive and widespread dicamba epidemic that has financially crippled all Plaintiffs across the country.

## COUNT I – STRICT LIABILITY – DESIGN DEFECT

463. Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

464.     Defendants designed, tested, developed, manufactured, marketed, distributed, and sold their dicamba-based products – including Defendant Monsanto's Xtend seeds, Defendant Monsanto's XtendiMax herbicide, and Defendant BASF's Engenia herbicide (hereinafter "dicamba-based products") – in their ordinary course of business.

465.     As described above, Defendants' dicamba-based products were in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe, non-defective herbicide, including Defendants XtendiMax and Engenia herbicides, was marketed by Defendants.   Thus, Defendants' dicamba-based products were defective and unreasonably dangerous due to Defendants' inability to provide an herbicide reasonably safe for its intended use.

466.     Defendants' dicamba-based products were used by farmers and applicators for the cultivation and protection of crops, which was their reasonably anticipated use.

467.     Plaintiffs were damaged as a direct result of such defective condition, which existed when these dicamba-based products were sold.

468.     At all times, Defendants sold dicamba-based products and knew of the defective condition and danger of their dicamba-based products.

469.     The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count I of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs,

expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT II – STRICT LIABILITY – FAILURE TO WARN

470.    Plaintiffs reallege all preceding paragraphs as if incorporated herein.

471.    Defendants sold their dicamba-based products in their ordinary course of business.

472.    As described above, Defendants' dicamba-based products were unreasonably dangerous at the time of sale.  Defendants' dicamba-based products were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third-parties of their defective condition because Defendants marketed no safe herbicide.

473.    Defendants did not give adequate warnings to purchasers or third-parties of the danger of their dicamba-based products.

474.    Defendants' dicamba-based products used by farmers and applicators, which was their reasonably anticipated use.

475.    Plaintiffs were damaged as a direct result of Defendants' dicamba-based products being sold without adequate warnings.

476.    At all times, Defendants sold their dicamba-based products and knew of the danger of their dicamba-based products.

477.    The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count II of this Complaint for (1) an award of such

compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT III – NEGLIGENT DESIGN AND MARKETING

478.    Plaintiffs reallege all preceding paragraphs as if incorporated herein.

479.    Defendants negligently designed and marketed their dicamba-based products.

480.    Defendants designed and marketed their dicamba-based products in their ordinary course of business.

481.    As described above, Defendants failed to use ordinary care in the design and marketing of their dicamba-based products because no herbicide reasonably safe for its intended use was marketed by Defendants for use with Xtend crops.  Thus, Defendants' dicamba-based products were defective and unreasonably dangerous due to the lack of any safe herbicide and no company exercising ordinary care would have designed or marketed such products.

482.    Defendants' dicamba-based products were used by farmers and applicators, which was their reasonably anticipated use.

483.    Plaintiffs were damaged as a direct result of such negligence in design and marketing by Defendants.

484.    The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count III of this Complaint for (1) an award of such

compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT IV – NEGLIGENT FAILURE TO WARN

485.     Plaintiffs reallege all preceding paragraphs as if incorporated herein.

486.     Defendants designed their dicamba-based products in their ordinary course of business.

487.     Defendants sold their dicamba-based products in their ordinary course of business.

488.     As described above, Defendants' dicamba-based products were defective and unreasonably dangerous at the time of sale.  Defendants' dicamba-based products were defective and unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third-parties of their defective and unreasonably dangerous condition because no safe herbicide was marketed by Defendants.

489.     Defendants failed to use ordinary care by neglecting to provide an adequate warning of the danger of their dicamba-based products.

490.     Defendants' dicamba-based products were used by farmers and applicators, which was their reasonably anticipated use.

491.     Plaintiffs were damaged as a direct result of Defendants' dicamba-based products being sold without an adequate warning.

492.     The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count IV of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT V – NEGLIGENT TRAINING

493.    Plaintiffs reallege all preceding paragraphs as if incorporated herein.

494.    Defendants sold their dicamba-based products to farmers and applicators knowing of their defective and unreasonably dangerous condition.

495.    Defendants had a legal duty to innocent third-parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm from the use of Defendants' dicamba-based products.

496.    Defendants had a duty to provide training to its employees, agents, and product users commensurate with the substantial risk of their unsafe dicamba-based products and the likelihood of their use.

497.    Defendants failed to use ordinary care in the training of their purchasers to prevent the unsafe use of their dicamba-based products use and the resulting damage to third-parties, including Plaintiffs.

498.    In fact, Defendants deliberately decided not to train their dealers, applicators, and farmers on their dicamba-based products until the EPA released final labels for XtendiMax and Engenia.

499.    Defendants never provided adequate warnings or training its employees, agents, or product users of the risks of harm to innocent third-parties.

500.     Defendants breached their legal duty to innocent third-parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm.

501.     Defendants' negligence, as described above, proximately damaged Plaintiffs as described herein.

502.     Plaintiffs have suffered damages to their person and property as described above.

503.     The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

        WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count V of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT VI – TRESPASS

504.     Plaintiffs reallege all preceding paragraphs as if incorporated herein.

505.     During the time of Defendants' trespass on Plaintiffs' land and crops, Plaintiffs' were farmers engaged in the planting, cultivation, harvesting, and selling of crops, such as tomatoes, peaches, soybean, corn, melons, and other agricultural crops, on their properties across the country.

506.     Defendants manufactured, distributed, and intentionally sold their dicamba-based products in the State of Missouri.

507. Defendants directly, intentionally, and physically invaded Plaintiffs' land and crops and caused substantial damage to Plaintiffs' land and crops.

508. The entry by Defendants upon Plaintiffs' land and crops through the sale and use of their dicamba-based products and their users and licensees' use of dicamba-based products was unauthorized.

509. Defendants' dicamba-based products consist of volatile herbicides that volatilized and moved off-target in the form of physical droplets, physical spray particles, and gas particles. These droplets and particles, all airborne, as a result of being sprayed by Defendants' users and licensees, volatilized or moved off-target and settled on Plaintiffs' land and crops, causing substantial damage to Plaintiffs' land and crops, as described above, rendering Plaintiffs' land and crops unfit for Plaintiffs' possession and interest in such land and crops.

510. Defendants' dicamba-based products, including Defendant Monsanto's XtendiMax herbicide and Defendant BASF's Engenia herbicide, have volatilized, drifted, and moved off-target during or after the time of their use and intruded on Plaintiffs' land and crops, interfering with Plaintiffs' right to exclusive and actual possession of their property with substantial damage to crops growing on Plaintiffs' property and the land where such crops are grown.

511. Further, Defendants intentionally instructed and encouraged users and licensees' of their herbicides to spray dicamba, including Defendants' XtendiMax and Engenia herbicides, on crops in Dunklin County, Missouri, and in other areas near Plaintiffs' property where Defendants' dicamba-based products can volatilize and move off-target and cause substantial damage to Plaintiffs' land and crops.

512.     Through a contractual relationship with their licensees, Defendants exercised control over their licensees and the use of Defendants' dicamba-based products that invaded Plaintiffs' land and crops and caused substantial damage to Plaintiffs' land and crops.

513.     In sum, Defendants have engaged in a chemical trespass to Plaintiffs' land.

514.     The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count VII of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT VII – CIVIL CONSPIRACY

515.     Plaintiffs reallege all preceding paragraphs as if incorporated herein.

516.     Defendants, in a scheme to improperly market, sell, and expand the sales and profits for their dicamba-based products, as described above in Counts I-VII, conspired with each other to their mutual economic benefit to create a market for their dicamba-based products and profit from the ecological disaster caused by them.

517.     The object of the conspiracy is to create an ecological disaster through the use of Defendants dicamba-based products that will force farmers to purchase their dicamba-based products out of self-defense and cause Defendants to reap great profits at the expense of innocent third-parties, like Plaintiffs, who have suffered damage.

518.    Early on, Defendants formed a partnership and a written joint licensing agreement to share technologies in an effort to speed their dicamba-based products to market.

519.    Indeed, Defendants are so intertwined that it is difficult to tell where one of their products ends and the next product begins.  For example, Defendant Monsanto's XtendiMax is the same herbicide as Defendant BASF's Clarity herbicide only with Defendant Monsanto adding an additive to Clarity called VaporGrip.

520.    Defendants share defective technology.

521.    Defendants invested in their dicamba production facilities in preparation for the demand that would be created by the damage that their dicamba-based products would cause.

522.    Defendants mutually developed and researched their dicamba-based products together, testing their dicamba-based products at Defendant Monsanto's research facilities.

523.    From their testing, Defendants knew the risks and dangers posed to innocent third-parties and non-DT crops from their dicamba-based products and conspired to conceal this information, especially on volatility, from the public, federal and state regulatory authorities, state legislatures, farmers, their licensees, consumers, and Plaintiffs.

524.    Defendants also conspired to inadequately train their employees, agents, distributors, farmers, growers, licensees, and applicators on how to use their dicamba-based herbicides and products to increase the damage and drive up demand for their dicamba-based products.

525.    Defendants' agreed not to provide warnings, effective notices, and proper labels and use instructions for their dicamba-based products to increase the damage and drive up demand for their dicamba-based products.

526.    Defendants conspired to advertise and market their dicamba herbicides as low volatility formulations of an inherently volatile herbicide, dicamba.  Through these coordinated marketing efforts, Defendants created demand for their dicamba-based products before and after the damage caused by them required action by federal and state governments.

527.    In 2015 and 2016, through their concerted activities, Defendants colluded in the release of Defendant Monsanto's Xtend seeds prior to either Defendant receiving approval for their dicamba-based herbicides, with knowledge and certainty that farmers would use older dicamba herbicides, such as Defendant BASF's Banvel or Clarity, on Xtend seeds and both Defendants would profit in the short-term and long-term.

528.    Defendants, through their agents and representatives, conspired to encourage legal and illegal spraying of their dicamba herbicides, regardless of how much damage it would cause.

529.    Defendants' conspiracy required the illegal spraying of Defendant BASF's older dicamba formulations on Defendant Monsanto's Xtend seeds to create fear in farmers – either use this technology or face the loss of their non-DT crops – until farmers no longer had a choice.

530.    Once the EPA approved XtendiMax and Engenia, Defendants jointly proceeded with a full-scale launch of their dicamba-based products, causing a wave of destruction to non-DT crops, including Plaintiffs' crops, in Missouri and other states.

531.    In response to the damage, Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had anything to do with Defendants' dicamba-based products, in order to ensure increased demand and profits for their dicamba-based products.

532.     Since 2015, the damage caused by Defendants' dicamba-based products has forced non-DT crop farmers to purchase and use Defendants' dicamba-based products out of self-defense – precisely as the conspiracy intended.

533.     Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

534.     Defendants also conspired to suppress the level of control they had over their licensees who used their dicamba-based products.

535.     Further, Defendants did not revoke any licenses with their licensees, including those farmers who used Defendants' dicamba-based products and caused damage to Plaintiffs' crops.  Defendants could have taken action to prevent or stop the damage that their dicamba-based products cause, but chose not to.  In fact, Defendants gave the green-light to illegal spraying by announcing they would take no action against licensees that sprayed illegally.

536.     The unlawful actions of Defendants resulted in damages to Plaintiffs, and thereby Plaintiffs were harmed in the ways and manners described above.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count VIII of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT VIII – PUNITIVE DAMAGES

537.     Plaintiffs reallege all preceding paragraphs as if incorporated herein.

538.     At all times, Defendants sold their dicamba-based products and knew of the defective condition and danger of their dicamba-based products.

539. At all times, Defendants sold their dicamba-based products and knew that their dicamba-based products could not be used safely and would damage third-parties, including Plaintiffs.

540. The actions of Defendants and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Defendants in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants, jointly and severally, on Count IX of this Complaint for (1) an award of such punitive damages as are fair and reasonable; and (2) for such further relief as the Court deems just and proper.

## COUNT IX – CLASS ACTION

541. Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

542. Plaintiffs ask this Court to certify a class action for Missouri Plaintiffs whose crops and land were damaged by Monsanto's willful and negligent release of a defective Xtend crop system since the beginning of 2015 and BASF's complicity in providing dicamba herbicides to be sprayed over-the-top.

543. Plaintiff Jerry Franks brings this action on behalf of himself and as representative of a class defined as follows: all agricultural farmers and agricultural farming organizations in Missouri who raise non-dicamba-tolerant crops and suffered damage to those crops from dicamba that was sprayed over-the-top of dicamba-tolerant cotton and soybean seeds from 2015 until trial in this matter.

544.     This case meets all of the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure.

545.     This class is so numerous that joinder of all members is impracticable.  The exact number of all class members can only be determined through discovery.  Based on the number of farmers and farms who have made pesticide drift complaints to the Missouri Department of Agriculture to date, there hundreds, if not thousands, of farmers and farms who have been damaged by dicamba across Missouri.  Upon information and belief, there are even more farmers who did not make drift pesticide complaints to the Missouri Department of Agriculture and yet suffered crop damage from dicamba.

546.     There are questions of law or fact common to the class.  All Plaintiffs suffered damage to their crops from dicamba drift, dicamba volatilization, and dicamba spraying when dicamba was applied to Monsanto's Xtend crops by farmers and applicators.  All Plaintiffs grow non-dicamba-tolerant crops or crops vulnerable to dicamba herbicides.  All Plaintiffs suffered crop damage and diminished crop yields due to dicamba.  All Plaintiffs suffered financial injury to their farms and their livelihoods due to dicamba.

547.     The common questions of law and fact include but are not limited to:

a)  Whether Plaintiffs suffered crop damage from dicamba due to the illegal spraying of dicamba on Monsanto's Xtend cotton and soybean seeds;

b)  Whether Plaintiffs suffered crop damage from dicamba drift and volatilization when farmers and applicators applied dicamba to Monsanto's Xtend seeds;

c)  Whether, in 2015 and 2016 and up until trial or resolution of this matter, Monsanto released its Xtend cotton and soybean seeds in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe herbicide was marketed by Monsanto or any other company;

d)  Whether the Xtend seeds are defective due to the lack of any safe herbicide;

e) Whether Monsanto knew its Xtend seeds were defective and knew that farmers who grew Xtend cotton and soybeans would spray dicamba on a seed designed to resist it;

f) Whether Xtend cotton and soybean seed purchasers and third parties had knowledge of the defective condition of the seeds because no safe herbicide was marketed by Monsanto or any other company;

g) Whether Monsanto gave an adequate warning to purchasers and third parties of the danger of these Xtend crops;

h) Whether Monsanto negligently designed and marketed its Xtend cotton and soybean seeds;

i) Whether Monsanto failed to use ordinary care by neglecting to provide an adequate warning of the danger of its Xtend crops;

j) Whether Defendants had a legal duty to innocent third parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm of the inevitable spraying that would occur to protect crops grown from Xtend cotton and soybean seeds;

k) Whether Defendants had a duty to provide training to purchasers commensurate with the substantial risk of dicamba spraying and the likelihood dicamba would be used to protect crops grown from Xtend cotton and soybean seeds;

l) Whether Defendants failed to use ordinary care in the training of its purchasers to prevent unsafe herbicide use and the resulting damage to third parties, including Plaintiffs;

m) Whether Monsanto deliberately decided not to train its dealers, applicators, and farmers on its Xtend products until the EPA released a final label for VaporGrip;

n) Whether BASF deliberately decided not to train its dealers, applicators, and farmers on the propriety of dicamba use on Xtend products until the EPA released a final label for Engenia;

o) Whether Monsanto's Xtend cotton and soybean seeds were fit for their ordinary purposes;

p) Whether Defendants suppressed or concealed material facts about the safety of Monsanto's Xtend crop system, its risks to third parties, including Plaintiffs, that Defendants created a situation where unsafe and harmful

spraying was not only likely but inevitable, and that Defendants were well-aware of the catastrophic damages that would occur to third parties as a result of this inevitable unsafe and harmful spraying;

q) Whether Defendants' representatives educated farmers and applicators regarding the application rates of dicamba for over-the-top application prior to any dicamba herbicides had been approved for such use;

r) Whether Monsanto conspired with BASF to sell dicamba and dicamba-tolerant crops at the expense of Plaintiffs;

s) Whether BASF's Engenia herbicide is defective and unreasonably dangerous when put to its reasonably foreseeable use;

t) Whether Monsanto's XtendiMax with VaporGrip Technology herbicide is defective and unreasonably dangerous when put to its reasonably foreseeable use;

u) Whether Defendants are liable for chemical trespass onto Plaintiffs' lands and crops;

v) Whether Defendants entered into a conspiracy as described herein; and

w) Whether punitive damages should be imposed upon Defendants for their conduct and the amount thereof.

548. Plaintiff Jerry Franks' claims are typical of the members of the class, in that Plaintiff raised non-dicamba-tolerant crops and those crops were damaged by dicamba herbicides applied to Monsanto's Xtend seeds by other farmers and applicators. Plaintiffs were damaged by the same wrongful conduct of Defendants.

549. If brought individually, the claims of each Plaintiff would necessarily require proof of the same material and substantive facts, and Plaintiffs seek the same remedies.

550. Plaintiff Jerry Franks will fairly and adequately protect the interests of the class. Named Plaintiff's interests are the same as other members of the class in holding Defendants responsible for the willful and negligent release of a defective crop system and unsafe and

defective herbicides, ensuring that Defendants do not do it again, and that injured farmers are fairly compensated for the results of Defendants' wrongful conduct.

551. Plaintiffs are represented by experienced counsel, well-versed in class actions and complex litigation.

552. The provisions of Rule 23(b)(3) are met in that questions of law or fact common to the class members predominate over individual questions and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

553. The common questions of law and fact are overwhelming, as described above and incorporated herein by reference.

554. Individual questions are minimal. For example, some members of the class may farm more or less acreage than other members of the class, yet the source and the cause of their damages are the same. To the extent Plaintiffs' damages created varying burdens on individuals, that can be resolved through individual damage criteria, the creation of subclasses, or an abbreviated procedure for processing individual claims.

555. All Plaintiffs suffered the same type of damage from Monsanto's defective crop system and seeds and BASF's dicamba herbicides. All Plaintiffs also suffered the same type of harm and were damaged from the same course of conduct by Defendants.

556. A single action adjudicating the legal rights of Named Plaintiff and the class would be more efficient and more desirable than individual litigation. As noted, class membership will likely run into the thousands, greatly inconveniencing the judicial system, and requiring needless duplication. Also, a single unified discovery process will greatly expedite this litigation and prevent needless, repetitive document productions and depositions from Defendants' corporate

officers, their distributors and seed and herbicide retailers, other seed and herbicide retailers, farmers who sprayed dicamba, and farmers who were damaged by dicamba, including Plaintiffs.

557. The efficiency of the unified discovery process and the prohibitive expense and complexity that would attend individual cases can be illustrated the enormity of the document production on the history, cultivation, marketing, development, sale, and distribution of Monsanto's Xtend products and BASF's Engenia products.

558. Likewise, a single trial court ruling upon Plaintiffs' common claims would greatly improve judicial efficiency.

559. All of these factors illustrate the benefits of concentrated litigation in a single forum.

560. The only issues requiring individual determination are the fact of and amount of each class members' damages.

WHEREFORE, Plaintiff prays that this Court:

• Determine that this action may be maintained as a class action with respect to Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for damages; declare named Plaintiff as the representative of the class; and appoint their lawyers as class counsel; and

• Award Plaintiffs damages on their Counts I-VIII of this Complaint for (1) such compensatory and punitive damages as are fair and reasonable; (2) their costs, expenses, and reasonable attorney's fees incurred in this matter; (3) additionally, for disgorgement of profits that Monsanto and BASF have received to date and will receive for the next five years from all sales of Xtend cotton and soybean seeds, Xtendimax

with VaporGrip Technology, and Engenia; and (4) such further relief as the Court deems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

By: _/s/ Beverly T. Randles_
Billy R. Randles, #40928MO
Beverly T. Randles, #48671MO
Angela M. Splittgerber, #53271MO
RANDLES & SPLITTGERBER, LLP
5823 N. Cypress Ave.
Kansas City, Missouri 64119
(816) 744-4779
bill@randleslaw.com
bev@randleslaw.com
angie@randleslaw.com

and

_/s/ L. Benjamin Mook_
L. Benjamin Mook, #49821MO
DAVIS GEORGE MOOK LLC
1600 Genessee Street, Suite 328
Kansas City, Missouri 64102
(816) 569-2629
(816) 447-3939 FAX
ben@dgmlawyers.com

*Attorneys for Plaintiffs*